Victoria SALAS, Appellant,

v.

TEXAS DEPARTMENT OF PROTEC-
TIVE AND REGULATORY SER-
VICES, Appellee.

No. 08–00–00226–CV.

Court of Appeals of Texas,
El Paso.

Jan. 31, 2002.

Robert V. Garcia, Jr., Odessa, for appellant.

Gary L. Bridges, Richard Keen, Dewey D. Britt, Assistant Ector County Attorney, Odessa, Cathren Page Koehlert, TX Dept. of Protective & Regulatory Services, Austin, for appellee.

Before Panel No. 4: BARAJAS, C.J., LARSEN, and McCLURE, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

Victoria Salas appeals the termination of her parental rights to her three children. Finding sufficient evidence to support the termination, we affirm.

## FACTUAL SUMMARY

The Texas Department of Protective and Regulatory Services ("DPRS") filed suit to terminate the parent-child relationship between Victoria Salas and the biological fathers of her three children in March 1999. Her daughter S.M. was born December 12, 1990; her son A.A. was born April 24, 1993, and her daughter A.M.A. was born February 3, 1995. Pablo Molina filed an affidavit of relinquishment of parental rights to S.M. Rolando Aguilar, the alleged father of A.A. and A.M.A., was served by publication and appeared through his attorney ad litem. The fathers have not appealed the termination of their respective rights.

Salas is mentally retarded and functions at a low intellectual level. In 1996, she lived with Aguilar and the children in Georgia. Between May 31 and August of that year, Georgia Children's Services received five referrals and removal was contemplated. Salas's mother, Maria Enfante, agreed to care for the children to prevent their removal from the home. Enfante was told that Salas could not take care of the children and that it would not be in their best interest to be returned to her. However, upon leaving Georgia, Salas and Aguilar moved with the children to Odessa while Enfante returned to her home in Garland.

DPRS first had contact with the children on November 13, 1996, when Niki Gray investigated a report that Aguilar had sexually assaulted S.M. Gray went to the home where Salas, Aguilar, and the children were living. She described the environment:

It's a very small home. There was no food in the freezer, the refrigerator, or the cupboards. There was [sic] three candy bars on the table. That's all the food there was. There was one mattress on the floor, and that's where the five family members were living and sleeping.

The children were hungry, thirsty, and unkept; A.A.'s front teeth "were almost completely rotted out." Gray removed the children that afternoon and placed them in foster care. When interviewed, S.M. disclosed the details of sexual penetration by Aguilar.[1] Enfante expressed concern that Aguilar was physically abusing the younger children as well. He had squeezed the baby until she turned blue and he had attempted to hold both of them down by laying on top of them. Gray did not consider Enfante's home as a placement option:

I had a concern that if she had told Georgia she would take care of the kids and protect them and then didn't and let them go back home to Victoria and Rolando—she had seen him squeeze the baby until he [sic] was blue. I had concerns about placing the kids there.

A temporary order was entered in November 1996. DPRS kept Salas informed regarding what she had to do to be in compliance with the order and visits were arranged for her with the children. Shortly after the hearing, however, Salas moved to Garland. DPRS did not know where she was and thus could not provide her with any services.

Salas was admitted to Terrell State Hospital on September 25, 1997, upon referral from the psychiatric unit at Parkland Memorial Hospital in Dallas. On December 15, 1998, she was committed to the San Angelo State School, a long term institutional care facility operated by the Texas Department of Mental Health and Mental

---

1. Aguilar was indicted for the offense of sexual assault against a child and an order of deferred adjudication was subsequently entered. He was deported in late 1997.

Retardation for persons dually diagnosed with mental retardation and a secondary mental health diagnosis. Salas has been diagnosed with impulse control disorder which manifests itself in inappropriate, indiscriminate sexual activity. She is under structured supervision and is accompanied by a staff member of the facility at all times.

Mary Loya was the caseworker assigned to the children in October 1998. She explained the terms of the service plan which the court implemented in an effort toward reunification. Salas was to provide a home, attend counseling and parenting classes, maintain a job, and undergo psychological assessment. Salas failed to attend the parenting classes, failed to complete the psychological assessment, and did not maintain contact with her children between November 1996 and January 1999. With the exception of one visit in April or June of 1997, Enfante did not call, write, or communicate with the children. Loya did not believe Enfante to be an appropriate placement for the children because she had allowed them to return to Salas after agreeing to care for them herself. Additionally, one of Enfante's sons who continued to reside with her had admitted to sexually assaulting S.M. In Loya's opinion, Salas cannot provide for the needs of her children and she will be unable to do so within a reasonable amount of time. She is unable to care for herself or hold a job, and has not demonstrated she can provide a safe home environment for her children.

Wendy Powell is Salas's social worker at the San Angelo State School. She testified that Salas receives job training and community living skills training, and is in the STOP program for patients exhibiting inappropriate sexual behavior. She also attends classes at the Success Center which focus on tackling the problems which keep patients at the facility. Salas is within the mild range of mental retardation and is one of the higher-functioning patients there. While individuals who are mildly retarded with no other problems do not need to be in a state school, behavior associated with a separate mental illness requires an individual with mild mental retardation to be institutionalized. Salas has run away from the school on several occasions and did so three times within the few weeks immediately preceding trial. If she were released and continued to engage in these activities, her personal safety would be at risk. Salas takes medication to modify her behavior—Depakote, which is a mood stabilizer, and Paxil, which is an anti-depressant—but Powell has not seen much improvement. When asked whether or not Salas would be ready to live on her own within a reasonable time, Powell explained that she would want to see an absence of problematic behavior for at least a year before considering discharge. Salas is on an eight-phase system where phase one requires that an attendant accompany her at all times. Phase one generally lasts a month. Phase two allows her to walk to and from her classes alone, in two-, three-, or five-minute time increments, and if she demonstrates any inappropriate behavior, she is returned to phase one. Salas has never been able to stay on phase two for more than a few days. Powell did not believe Salas could take care of herself or her children if discharged.

Lynn Zaruba oversees Salas's psychological and behavioral therapy at San Angelo. He described her inappropriate behavior as hypersexuality. She is indiscriminate when choosing a sexual partner and had attempted to elope three times in the weeks just before trial. She has also had physically aggressive encounters with other patients. She was currently

on phase one, which he described as follows:

It states that [Salas] will be on eye line supervision zero to 40 feet at all times she is not in a program or on the home.[2] When she's at program or on the home, she'll be intermittently monitored at approximately every 15 minutes by staff unless she is asleep. If no incidents of improper sexual behavior or elopement occur for one month, she will progress to phase two.

Phase two allows her to go to and from scheduled programs without supervision. Salas has never progressed to phase three, which would allow her approximately one hour of unsupervised time, nor did Zaruba anticipate her progressing to that level within a reasonable period of time. Whenever Salas has been allowed free time, she has had "some kind of sexual incident" within a week. He has seen regression rather than improvement in the eight months he has treated her, and does not envision her being discharged within three years.

Salas told the trial court that she loves her children, likes being with and talking to them, and wants to keep them with her. She had last seen them a month before trial and they told her they wanted to be with her. She does not want the children to be adopted. Instead, she wanted the court to place them with Enfante until she is discharged. Salas believed her children would be happy there, that she would be released within a year, and that she could make a good home for them at her mother's. She was taking her medicine and going to her classes. She had never seen Aguilar abuse her daughter. He had denied any wrongdoing when she asked him, and she did not know the outcome of the criminal proceedings against him.

At the time of trial, the children had been living in a foster home since August 1999. The foster parents were willing to adopt the children and able to provide for their needs. The children were described as happy; they address their foster parents as "mom and dad," and "really don't want to go back" to their mother. They have not asked for their grandmother or expressed a desire to live with her. No other family members have expressed interest in having the children placed with them. The children's attorney ad litem informed the trial court that the children were doing exceptionally well, had progressed tremendously, liked living in their prospective adoptive home, and wanted to stay there. He recommended termination.

At the close of the evidence, the trial court terminated Salas's parental rights, noting that he was doing it "with a heavy heart" and calling it "a crummy deal." The parental rights of Molina and Aguilar were terminated as well. Although DPRS alleged five statutory grounds for termination, the trial court found only two of the grounds were supported by clear and convincing evidence:

1.  that Salas had failed to comply with the provisions of the court's order established to return the children to her after they were removed under Chapter 262 for abuse or neglect [Tex.Fam.Code Ann. § 161.001(1)(O)(Vernon Pamphlet 2002)], and

2.  that Salas has a mental and emotional illness that renders her incapable of providing for the needs of the children [Tex.Fam.Code Ann. § 161.003 (Vernon 1996)].

In five issues for review, Salas complains that the evidence is legally and factually insufficient to establish the statutory requisites for involuntary termination. Be-

---

**2.** "On the home" refers to the dormitory-type quarters where several patients are living.

cause we find the evidence sufficient to support termination under Section 161.003, we do not address her first two issues for review concerning her compliance with the service plan and the court's findings under Section 161.001(1)(O).

## TERMINATION OF THE PARENT–CHILD RELATIONSHIP

■ The natural right that exists between parents and their children is one of constitutional dimension. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Clark v. Dearen*, 715 S.W.2d 364, 366 (Tex.App.-Houston [1st Dist.] 1986, no writ). For this reason, statutes authorizing involuntary termination are construed in favor of the parent and any effort by the State to terminate the relationship is strictly scrutinized. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *Ybarra v. Texas Department of Human Services*, 869 S.W.2d 574, 576 (Tex. App.-Corpus Christi 1993, no writ); *Clark*, 715 S.W.2d at 368.

### Statutory Basis

At the time this suit was filed, Section 161.003(a) provided:

(a) The court may order termination of the parent-child relationship in a suit filed by the Department of Protective and Regulatory Services if the court finds that:

(1) the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;

(2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;

(3) the department has been the temporary or sole managing conservator of the child of the parent for the six months preceding the filing of the petition; [3]

(4) the department has made reasonable efforts to return the child to the parent; and

(5) the termination is in the best interest of the child.

TEX.FAM.CODE ANN. § 161.003(a). It is somewhat perplexing why the statute specifically articulates that only the second element found in subsection (a)(2) must be proved by clear and convincing evidence. Each of the elements for termination under Section 163.001 must be established by clear and convincing evidence. TEX.FAM. CODE ANN. § 161.001; *see Doyle v. Texas Department of Protective and Regulatory Services*, 16 S.W.3d 390 (Tex.App.-El Paso 2000, pet. denied); *Holick*, 685 S.W.2d at 20; *In the Interest of B.R.*, 950 S.W.2d 113, 117 (Tex.App.-El Paso 1997, no writ). And before the clear and convincing evidence standard was codified, the Texas Supreme Court mandated its application. *In the Interest of G.M.*, 596 S.W.2d 846, 847 (Tex.1980)("Hereafter, the 'clear and convincing evidence' standard of proof will be required in all proceedings for involuntary termination of the parent-child relationship."). Abiding by that mandate, DPRS must here prove each element of

---

**3.** Effective September 1, 2001, subsection (a)(3) was amended to read:

(3) the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination held in accordance with Subsection (c).

Acts 2001, 77th Leg., R.S., ch. 496, § 1, 2001 TEX.GEN.LAWS 947. The amendment applies to suits filed on or after the effective date of the statute; suits filed before the effective date are governed by the law in effect on the date suit was filed. Acts 2001, 77th Leg., R.S., ch. 496, § 2(b), 2001 TEX.GEN.LAWS 947.

Section 163.003 by clear and convincing evidence. "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX.FAM.CODE ANN. § 101.007 (Vernon 1996); *Doyle,* 16 S.W.3d at 394; *In the Interest of B.R.,* 950 S.W.2d at 117. It is an intermediate standard of proof, falling between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *Doyle,* 16 S.W.3d at 394; *In the Interest of B.R.,* 950 S.W.2d at 117. In this case, the trial court found the evidence sufficient on two of the five alleged grounds. Therefore, we will affirm if legally and factually sufficient evidence supports either of those grounds and the finding that termination is in the best interest of the children.

### Standard of Review

A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. There are basically two separate "no evidence" claims. When the party having the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." When the party without the burden of proof suffer an unfavorable finding, the challenge on appear is one of "no evidence to support the finding." *See Creative Manufacturing, Inc. v. Unik, Inc.,* 726 S.W.2d 207 (Tex.App.-Fort Worth 1987, writ ref'd n.r.e.). The standard of review requires a determination by the appellate court as to whether, considering only the evidence and inferences that support a factual finding in favor of the party having the burden of proof in a light most favorable to such findings and disregard-

ing all evidence and inferences to the contrary, there is any probative evidence which supports the finding. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Southwest Craft Center v. Heilner,* 670 S.W.2d 651 (Tex.App.-San Antonio 1984, writ ref'd n.r.e.); *Terminix International, Inc. v. Lucci,* 670 S.W.2d 657 (Tex.App.-San Antonio 1984, writ ref'd n.r.e.); *Dayton Hudson Corp. v. Altus,* 715 S.W.2d 670 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.). If more than a scintilla of evidence supports the finding, the "no evidence" point fails. *Tseo v. Midland American Bank,* 893 S.W.2d 23, 25 (Tex.App.-El Paso, 1994, writ denied); *Hallmark v. Hand,* 885 S.W.2d 471, 474 (Tex.App.-El Paso 1994, writ denied).

With regard to factual sufficiency, we apply a heightened standard of review when the burden of proof at trial is by clear and convincing evidence. *In the Interest of B.R.,* 950 S.W.2d 113, 118–19. After considering all of the evidence, we must determine, not whether the trier of fact could reasonably conclude that the existence of a fact is more probable than not, as in ordinary civil cases, but whether the trier of fact could reasonably conclude that the existence of the fact is highly probable. Under this standard, we must consider whether the evidence was sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegations sought to be established. *Id.* at 119. We will sustain an insufficient evidence point of error only "if the fact finder could not have reasonably found the fact was established by clear and convincing evidence." *Id.*

### Mental Illness

In her third and fourth issues for review, Salas complains that the evidence is legally and factually insufficient to support termination on the ground that she in un-

able to care for her children because of a mental illness or deficiency. Specifically, she challenges whether DPRS presented proof of the durational and reunification elements.

## Durational Element

Section 161.003 does not require scientific certainty that Salas's mental illness will continue until the children are eighteen; it only requires reasonable probability. *Spurlock v. Texas Department of Protective and Regulatory Services*, 904 S.W.2d 152 (Tex.App.-Austin 1995, writ denied); *In the Interest of C.D. and B.P.*, 962 S.W.2d 145, 148 (Tex.App.-Fort Worth 1998, no pet.). In *Spurlock*, the mother had suffered from serious mental health problems for nine years. Her mental illness had forced her to be hospitalized numerous times and she had a history of noncompliance with her medication, which had been prescribed for impulse control and mood stabilization. Her doctor testified that Spurlock's condition would not resolve itself with time and if she discontinued her medication or left her structured care environment to live on her own, her condition could deteriorate to a point that she would need hospitalization again.

Here, the witnesses testified to facts supporting the conclusion that Salas's mental illness and retardation would continue until the children are eighteen. Despite a warning from the Georgia Children's Services that she was unable to properly care for the children, she did not comply with an arrangement to move in with her mother. In the absence of her mother's supervision, the family's living conditions were deplorable and the children were not provided with the basic necessities. Salas was unable to prevent the sexual and physical abuse of her children. She has been institutionalized since September 25, 1997. Despite medication, she has shown no improvement and, in fact, she has regressed rather than progressed. She is on phase one of an eight-phase system and has been unable to remain on phase two for more than a few days. She has never progressed to phase three. It would be at least a year before the staff would even begin to consider discharging her, and it was unlikely that she would be discharged within three years. Her social worker did not believe she would be able to care for herself or her children even if she were discharged. She would be unable to hold a job or provide a safe home environment for the children. We conclude the evidence is both legally and factually sufficient to support the durational requirement. In all reasonable probability, the mental illness and mental deficiency from which Salas suffers will continue to render her unable to provide for her children's needs until their respective eighteenth birthdays.

## Reunification

Salas next contends DPRS did not make reasonable efforts to reunify her family. The record clearly indicates there were few options available. Prior efforts to keep the family together had failed. When Georgia Children's Services was considering removing the children from their mother, Enfante agreed to step in. Despite those promises, Salas moved with the children to Odessa rather than moving into her mother's home in Garland. Once DPRS became involved, Salas was provided with a bilingual social worker and a service plan. Salas failed to attend the requisite parenting classes, did not complete the psychological assessment and lost contact with her children. She moved from Odessa to Garland without notifying DPRS of her whereabouts and within a year was hospitalized. She has remained institutionalized ever since. The San An-

gelo State School does not offer a home for the children, a work program, child care, or parenting classes. Family placement is not workable. Molina has relinquished his rights to S.M.; Aguilar has been deported. Other than Enfante, no family members have stepped forward or even inquired about the children's well-being. And while Enfante expressed a willingness to care for the children, she had previously allowed Salas to regain possession of the children despite an admonishment that Salas was unable to care for them and that it would not be in their best interest to be returned to their mother. Moreover, one of Enfante's sons had admitted to sexual abuse of S.M. and he continued to reside in Enfante's home. On these facts, we cannot surmise what other steps DPRS could have taken to reunite the family and, given Salas's prognosis, additional efforts appear futile. The evidence is both legally and factually sufficient to support the reunification element. The third and fourth issues for review are overruled.

### Best Interest

Finally, Salas argues in Issue No. Five that the evidence is factually insufficient to support the trial court's finding that termination is in the children's best interest. *See* TEX.FAM.CODE ANN. § 161.003(a)(5). Termination is always a sad choice, and this case is undeniably tragic for all parties. Salas suffers from impulse control disorder and is mildly retarded. We have no doubt she loves her children but she is unable to care for herself or her children as a result of these problems.

The Texas Supreme Court has articulated nine factors to be considered in deciding the best interest of a child:
- the desires of the child;
- the emotional and physical needs of the child now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of the individuals seeking custody;
- the programs available to assist these individuals to promote the best interest of the child;
- the plans for the child by these individuals or by the agency seeking custody;
- the stability of the home or proposed placement;
- the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
- any excuse for the acts or omissions of the parent.

*Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976). Not all of these factors need be decided against the parent in order to find that termination is in the children's best interest. *See Dressler v. Aldridge,* 567 S.W.2d 48 (Tex.Civ.App.-El Paso 1978, no writ)(describing several factors favorable towards the father and upholding termination of the father's parental rights).

The evidence demonstrates that both Salas and Enfante have inadequate abilities to parent these children. The programs available to assist Salas, and her chances for improvement, are limited. She would be a danger to herself if released at the present time, and the San Angelo State School does not offer a program which would meet the children's needs. Salas would be unable to care for the children herself. She has been unable to protect her children from the dangers of sexual and physical abuse. Enfante has not followed through on prior promises to care for the children and not return them to their mother's unsupervised possession. Placement with Enfante would also jeopardize the safety of the girls in the future,

given her son's admitted sexual abuse of S.M. and his continued residency in the home.

Furthermore, the record reveals that the children are happy and wish to remain with their foster parents. They are doing exceptionally well and have progressed tremendously. Termination would be consistent with the emotional and physical needs of the children both now and in the future. Salas will be institutionalized indefinitely. The goal of establishing a stable, permanent home for a child is a compelling interest of the government. *Hann v. Texas Department of Protective and Regulatory Services,* 969 S.W.2d 77, 83 (Tex.App.-El Paso 1998, pet. denied); *see also In the Interest of H.C. and S.C.,* 942 S.W.2d 661, 665 (Tex.App.-San Antonio 1997, no writ)(fact that father's custody would be delayed because he was in jail was one of several reasons that termination was in child's best interest). The Department plans to place the children for adoption with their foster parents.

While Salas has excellent excuses for her acts or omissions in that she is mentally ill and mildly retarded, each of the *Holley* factors need not be negated to prove best interest. *See Dressler,* 567 S.W.2d at 48. The young age of the children also merits consideration in the determination of best interest as does the issue of permanence. *See Hann,* 969 S.W.2d at 83; *Dupree v. Texas Department of Protective and Regulatory Services,* 907 S.W.2d 81, 87 (Tex.App.-Dallas 1995, no writ)(holding that the need for permanence is the paramount consideration for the child's present and future physical and emotional needs). The children's desires, the stability of the adoptive home, the past lack of contact between the children and Salas, the probability that Salas will not be de-institutionalized, and the inability of Salas to care for her chil-

dren combine together to weigh in favor of termination. Because the evidence is both legally and factually sufficient to support the trial court's finding that termination is in the best interest of the children, we overrule the fifth issue for review. And because we have found the evidence sufficient to support termination under Section 161.003, we need not address the first two issues for review which attack the sufficiency of the evidence to support termination under Section 161.001(1)(O). Having overruled the remaining three issues, we affirm the judgment of the trial court.