COURT
OF APPEALS
SECOND
DISTRICT OF TEXAS
FORT WORTH
NO. 2-02-377-CV
 
IN THE INTEREST OF B.L.M. AND J.L.M., JR., CHILDREN
 
------------
FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY
------------
OPINION
------------
I. Introduction
Following a bench trial, the trial
court found that Appellant J.M.'s parent-child relationship with his daughter,
B.L.M., and son, J.L.M., should be terminated and entered judgment accordingly.
In six issues, J.M. complains that the evidence is factually insufficient to
support the statutory grounds relied upon by the trial court to terminate his
parental rights and that the Texas Department of Protective and Regulatory
Services ("TDPRS") violated the Americans With Disabilities Act
("ADA") in the course of its treatment of him. We will affirm.
II. Factual and
Procedural History
J.M. is the father of B.L.M., born
in December 1993, and J.L.M., born in November 1995 (the "Children").
From approximately 1994 to 1996, J.M. resided in California with, A.M., the
mother of the Children, B.L.M. and, after his birth, J.L.M. The family lived in
a number of locations and relied on welfare as a means of support. J.M.
testified, and A.M. confirmed, that during this time A.M. used drugs, including
methamphetamine. J.M. also used narcotics with A.M. before he "committed
[himself] to the church." Additionally, there was some evidence of domestic
violence between J.M. and A.M. around this time. In 1996, A.M. took the Children
and moved to Wichita Falls, Texas. At the time of the move, B.L.M. was two years
of age and J.L.M. was just six months old. J.M. remained in California and did
not have any personal contact with the Children until the summer of 2000 when
A.M. and the Children visited him in California. In October 2000, TDPRS removed
the Children from A.M.'s home based on her alleged neglectful supervision of the
Children and continued narcotics use. TDPRS implemented a service plan for A.M.
with the goal of returning the Children to her. A.M., however, tested positive
for narcotics in multiple drug screenings. TDPRS determined that A.M.'s drug-use
was not improving. A.M. voluntarily relinquished her parental rights to the
Children in April 2002.
J.M. contacted TDPRS for the first
time in December 2000, two months after the Children had been removed from their
mother's home. Between December 2000 and May 2001, J.M. contacted TDPRS three or
four times, and between May 2001 and May 2002, TDPRS heard from J.M. only twice.
J.M. contacted the Children a number of times while they were in foster care.
Prior to the Children's placement in foster case, J.M. sent the Children
Christmas presents one year, and sent money to V.A., A.M.'s mother, on at least
one occasion. Excluding these gestures, J.M. provided no support for the
Children before or after A.M. voluntarily relinquished her parental rights.
After A.M. and the Children moved
to Wichita Falls, J.M.'s financial status did not improve. J.M. testified that
he has had between fifteen and twenty jobs over the last five years. He has been
out of work for more than a month at a time during the last year and one-half.
J.M. resided in a number of different locations during this time, including his
brother's residence and a barn. J.M.'s parental rights were terminated in April
2002 after a default judgment was rendered against him for failing to appear for
trial. After learning that his parental rights had been terminated, J.M. filed a
motion for a new trial asserting that he had been involuntarily committed in a
mental institution in California from February 2002 to April 2002 and had
therefore not received proper notice of the termination suit. The trial court
agreed and granted J.M. a new trial.
J.M. moved to Wichita Falls in May
2002. Following J.M.'s arrival in Wichita Falls, TDPRS began working with J.M.
to evaluate and improve his parenting skills. J.M. met with Marilyn Morgan
("Morgan"), a parent worker with TDPRS, in June 2002 and was informed
of the various services TDPRS wished to provide. These included, among other
things, a psychological evaluation, counseling, and parenting classes. J.M.
initially declined TDPRS's services, but later agreed to participate in the
suggested programs. J.M. nonetheless would not complete two out of three
portions of the psychological evaluation; he did not attend the scheduled
individual counseling sessions; he refused to sign the release of information
form to permit TDPRS to obtain his mental health records; and, he attended only
two parenting classes.
TDPRS permitted J.M. to contact the
Children through supervised telephone calls. The Children seemed
"excited" to hear from their father during the first phone
conversation. In subsequent telephone conversations, J.M. and the Children
discussed how the Children were doing and their experiences at Vacation Bible
School. During parts of the conversations, however, J.M. responded to the
Children's remarks with long, complicated answers that the Children had
difficulty understanding. Morgan testified that, as J.M.'s phone visits with the
Children progressed, J.M. repeatedly discussed the supernatural and supernatural
things he had experienced. Morgan also testified that the Children appeared to
become bored during the conversations, would ask whether the conversation was
almost over, and would often comment that they did not understand what J.M. was
talking about. Furthermore, Morgan said that the Children's foster parents
reported that the Children had a tendency to engage in "disruptive behavior
for a day or two after each phone visit."
TDPRS learned that J.M. is a
noncompliant paranoid schizophrenic who suffers from delusional thought and
loosening of associations. TDPRS filed a second petition to terminate J.M.'s
parental rights to the Children based upon his noncompliance with TDPRS's
service plan, his inability to care for the Children based on his mental
illness, and six other grounds. Following a bench trial, the trial court found
that five of the termination grounds pleaded by TDPRS were supported by clear
and convincing evidence justifying termination of J.M.'s parental rights. The
trial court entered an order terminating J.M.'s parental rights to the Children,
and this appeal followed.
III. Burden of
Proof in Termination Proceedings
A parent's rights to "the
companionship, care, custody, and management" of his or her children are
constitutional interests "far more precious than any property right." Santosky
v. Kramer, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); accord
Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). The United States Supreme
Court, in discussing the constitutional stature of parental rights, states,
"[T]he interest of parents in the care, custody, and control of their
children--is perhaps the oldest of the fundamental liberty interests recognized
by this Court." Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct.
2054, 2060 (2000). Nonetheless, while parental rights are of constitutional
magnitude, they are not absolute. In re C.H., 89 S.W.3d 17, 26 (Tex.
2002). Just as it is imperative for courts to recognize the constitutional
underpinnings of the parent-child relationship, it is also essential that
emotional and physical interests of the child not be sacrificed merely to
preserve that right. Id.
In proceedings to terminate the
parent-child relationship brought under section 161.001 of the family code,
TDPRS must establish one or more of the acts or omissions enumerated under
subsection (1) of the statute and must also prove that termination is in the
best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon 2002); Swate
v. Swate, 72 S.W.3d 763, 766 (Tex. App.--Waco 2002, pet. denied). Both
elements must be established; termination may not be based solely on the best
interest of the child as determined by the trier of fact. Tex. Dep't of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). Because of the
elevated status of parental rights, the quantum of proof required in a
termination proceeding is elevated from the preponderance of the evidence to
clear and convincing evidence. Santosky, 455 U.S. at 746, 102 S. Ct. at
1391; see also Tex. Fam. Code Ann. § 161.001.
Clear and convincing evidence is
"the measure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought to
be established." Tex. Fam. Code Ann. § 101.007; In re J.F.C., 96
S.W.3d 256, 264 (Tex. 2002); In re C.H., 89 S.W.3d at 25. This
intermediate standard falls between the preponderance standard of ordinary civil
proceedings and the reasonable doubt standard in criminal proceedings. State
v. Addington, 588 S.W.2d 569, 570 (Tex. 1979); In re D.T., 34
S.W.3d 625, 630 (Tex. App.--Fort Worth 2001, pet. denied) (op. on reh'g). While
the proof must be more than merely the greater weight of the credible evidence,
there is no requirement that the evidence be unequivocal or undisputed. Addington,
588 S.W.2d at 570. Termination proceedings should be strictly scrutinized, and
involuntary termination statutes are strictly construed in favor of the parent. Holick,
685 S.W.2d at 20-21; In re A.V., 849 S.W.2d 393, 400 (Tex. App.--Fort
Worth 1993, no writ).
IV. Factual
Sufficiency of the Evidence
J.M. complains that the evidence is
factually insufficient to support any of the five statutory termination grounds
found by the trial court. J.M. does not contest the trial court's finding that
termination of the parent-child relationship is in the best interests of the
Children. Therefore, we examine only the first prong of the parent-child
relationship termination inquiry.
A.  Standard of Review
The higher burden of proof in
termination cases alters the appellate standard of factual sufficiency review. In
re C.H., 89 S.W.3d at 25. "[A] finding that must be based on clear and
convincing evidence cannot be viewed on appeal the same as one that may be
sustained on a mere preponderance." Id. In considering whether the
evidence of termination rises to the level of being clear and convincing, we
must determine "whether the evidence is such that a fact finder could
reasonably form a firm belief or conviction" that the grounds for
termination were proven. Id. Our inquiry here is whether, on the entire
record, a fact finder could reasonably form a firm conviction or belief that the
parent violated at least one of the provisions deemed found in support of the
trial court's judgment. See Tex. Fam. Code Ann. §§ 161.001(1),
161.003; In re C.H., 89 S.W.3d at 28.
B. Trial Court's Grounds
for Termination
The trial court found that J.M. (1)
knowingly placed or knowingly allowed the Children to remain in conditions or
surroundings which endangered their physical or emotional well-being; (2)
voluntarily left the Children alone or in the possession of another without
providing adequate support of the Children and remained away for a period of at
least six months; (3) failed to support the Children in accordance with his
ability during a period of one year ending within six months of the date of the
filing of the petition; (4) failed to comply with the provisions of a court
order that specifically established the actions necessary for the father to
obtain the return of the Children who have been in the permanent or temporary
managing conservatorship of TDPRS for no less than nine months; and (5) has a
mental or emotional illness or mental deficiency that renders him unable to care
for the Children. See Tex. Fam. Code Ann. §§ 161.001(1)(D), (C), (F),
(O), 161.003.
C.  Mental Illness
Rendering J.M. Unable to Care for Children
In his fifth
issue, J.M. contends that the evidence is factually insufficient to support the
trial court's finding that he has a mental or emotional illness or mental
deficiency that renders him unable to care for the Children. See Tex.
Fam. Code Ann. § 161.003. Termination of the parent-child relationship is
permitted under section 161.003(a) if the court finds: (1) the parent has a
mental or emotional illness or a mental deficiency that renders the parent
unable to provide for the physical, emotional, and mental needs of the child;
(2) the illness or deficiency, in all reasonable probability, proved by clear
and convincing evidence, will continue to render the parent unable to provide
for the child's needs until the eighteenth birthday of the child; (3) the
department has been the temporary or sole managing conservator of the child of
the parent for at least six months preceding the date of the hearing on the
termination; (4) the department has made reasonable efforts to return the child
to the parent; and (5) the termination is in the best interest of the child.
Tex. Fam. Code Ann. § 161.003(a). J.M. does not challenge the sufficiency of
the evidence to establish subsections (1), (3), (4), and (5). He limits his
factual sufficiency challenge to the evidence supporting subsection (2): that
his illness in all reasonable probability will continue to render him unable to
provide for the Children's needs until their eighteenth birthdays.
J.M. contends that none of the
witnesses testified with certainty that his mental illness would
continue to render him unable to provide for the Children's needs until they
reached the age of eighteen. The record contains the following evidence
concerning the continuing nature J.M.'s mental illness.
J.M. testified at trial and denied
that he suffers from paranoid schizophrenia, said he does not hear voices,
affirmatively stated that he does not presently take medication, and
probably most significant of all, exhibited an intent to never take
medication in the future. J.M. testified that in the past taking medication hurt
him instead of helping him. J.M. testified:

        
 I was on Zyprexa for approximately a year, I think it was, a year and a half
 maybe. Long enough to know that they had placed the veil upon my spiritual
 mind, and I think it stops it, shuts down the nerve, it puts a veil over your
 mind and closes it off and keeps the neurons from firing, and the expansions
 of those neurons from actually making the sparks to keep your brain from
 generating. I wouldn't call it electromagnetic fields, but the way it actually
 generates the creativity of your mind.

J.M. exhibited signs of his
paranoid schizophrenia throughout his testimony. He mentioned, "The
gentlemen who picked me up while I was in California . . . represented
themselves as officers of the law, which I'm sure they are, but they were
probably Navy Seals dressed as an officer of the law . . . ." J.M. was also
convinced that "[t]he government has probably well watched over me"
and that "[t]he President probably thinks highly of me . . . ."
J.M. testified that he could take
care of the Children. He admitted that he had, and would have in the future,
very limited financial resources. At the time of the trial, J.M. was currently
employed and was working five days a week, eight hours a day. J.M. said that he
did not want to have his parental rights terminated, that he wanted to continue
to have a relationship with the Children, and that he loves the Children.
Dr. David Sabine ("Dr.
Sabine") performed a psychological evaluation on J.M. at CPS's request. Dr.
Sabine testified that J.M. suffered from paranoid schizophrenia and that
schizophrenia is a "prolonged illness," a lifetime disease.(1)
Dr. Sabine explained:

        
 The process of paranoid schizophrenia is a dementing process, and it affects
 the brain and is not simply an emotional disorder. There is a disruption in
 the neural pathways of that person. The ventricles in the brain, which are the
 spaces in the brain, are normally filled with fluid and enlarged, because the
 brain is shrinking over time. And at this time there is no effective cure for
 schizophrenia, and it is a progressive illness.

Consistent treatment and medication is essential to stabilize the effects of
the disease. Consequently, one of the critical factors in helping individuals
with paranoid schizophrenia to successfully live with this disease is the
"person's willingness to submit to treatment." He said that people
with paranoid schizophrenia often have a difficult time complying with
treatment, however, because of the paranoia; it is difficult for them to trust
others, including treatment providers. A person suffering from this illness who
has been medication noncompliant in the past is much less likely to become
medication compliant in the future. Dr. Sabine testified that, based on his
evaluation of J.M., significant evidence existed that J.M. was resistant to
treatment or to even acknowledging his difficulties even when Dr. Sabine told
him directly that treatment and willingness to get treatment might be critical
to his ability to parent the Children.
Dr. Sabine explained that most
noncompliant paranoid schizophrenics lack the ability to exercise good judgment,
a trait that parents should have. He also said that the unpredictability of
J.M.'s disease could put the Children at risk because, while J.M. might function
as a good parent one day, he could later begin to believe that the Children were
conspiring against him.(2)  Dr. Sabine
opined that a high probability exists that J.M. will not be able to parent
effectively and that the interests of the Children would be served best by not
being in an environment "where they couldn't quite predict or understand
how this person was behaving or where they were coming from." Dr. Sabine,
however, admitted that he could not say with certainty that J.M.'s illness would
prevent him from being able to successfully parent his children or that he would
remain noncompliant in the future.
Cheryl Polly ("Polly"), a
licensed professional counselor in Wichita Falls, testified that B.L.M. and
J.L.M. were referred to her for counseling by their Child Protective Services
caseworker. She testified that the Children need a stable home, consistent
direction and consistent care. Polly worked at the Mental Health-Mental
Retardation facility in Tyler for about seven years, and testified that based on
her experience individuals suffering from paranoid schizophrenia must be treated
consistently with medication. She said that some schizophrenics who maintain
their treatment and medication regime may function at a high level, others may
not. Persons suffering from paranoid schizophrenia who are employed are almost
always on medication. Even then, they sometimes experience difficulty
maintaining employment because delusions sometimes occur at work. Polly said
that it is not possible, however, for a person suffering from paranoid
schizophrenia to maintain a job and function at a high level if he or she is not
taking medication. Finally, Polly testified that paranoid schizophrenics can
view others as enemies, even their own children, and that, in her opinion,
J.M.'s chances of being a sufficient parent are not very good given his current
mental health. Polly conceded, however, that she had "no clinical
experience" with J.M. and could not say that he would be unable to be a fit
parent for the Children sometime before the Children turned eighteen.
The trial judge questioned the
Children in chambers in an effort to gain some understanding of how they felt
concerning the situation. The Children stated that their father calls them on
the telephone weekly, he never does anything to scare them, and that he used to
feed them hot dogs and candy. When asked how they would like to "start all
over again with a new family," B.L.M. responded by saying, "It would
be better than with my mama and daddy." When the judge asked the Children
how they would feel if they were never allowed to see their parents again until
they reach the age of eighteen, at which point they could see them if they so
desired, B.L.M. said she wouldn't feel happy or sad and J.L.M. said
"good." Finally, the Children both responded that they would be
"happy" if they were told that they were not allowed to see their
father until age eighteen. B.L.M. explained she would feel happy "because
he wouldn't make the right decisions."
J.M. is correct that no witness
testified with certainty that in all reasonable probability his mental
disease will continue to render him unable to provide for the Children's needs
until their eighteenth birthday. But certainty is not the governing standard.
Instead, TDPRS bore the burden of proving by clear and convincing evidence that
J.M.'s mental illness, "in all reasonable probability," will
continue to render him unable to care for the Children until they reach the age
of eighteen. Tex. Fam. Code Ann. § 161.003(a)(2). "In all reasonable
probability" does not mean beyond a reasonable doubt. Salas v. Tex.
Dep't of Protective and Regulatory Servs., 71 S.W.3d 783, 790 (Tex.
App.--El Paso 2002, no pet.). Nor does the subsection require scientific
certainty. Id.
Applying this standard, viewing all
the evidence, giving due consideration to evidence that the fact finder could
reasonably have found to be clear and convincing, the evidence presented is such
that a fact finder could reasonably form a firm belief or conviction that in all
reasonable probability J.M. will be unable to provide for the Children's
physical, emotional, and mental needs until their eighteenth birthdays. See
Tex. Fam. Code Ann. § 161.003(a)(2); In re C.H., 89 S.W.3d at 25. J.M.
himself testified that he did not intend to take medication for his disease. In
fact, he denied that he had a disease. Both Polly and Dr. Sabine testified that
paranoid schizophrenia is a life-long illness requiring consistent treatment and
medication to enable an individual with the disease to function at a high level.
They both stressed that a person suffering from paranoid schizophrenia must take
medication in order to maintain a lifestyle conducive to parenting children.
They both testified that the likelihood of a noncompliant paranoid schizophrenic
consistently functioning at a high level is extremely low. Dr. Sabine explained
the grave risks medication noncompliant paranoid schizophrenics create for those
around them. We overrule J.M.'s fifth issue. See, e.g., In re D.L.N.,
958 S.W.2d 934, 941 (Tex. App.--Waco 1997, pet. denied); Altamirano v. Dir.
of Travis County Child Welfare Unit, 465 S.W.2d 393, 395 (Tex. Civ.
App.--Austin 1971, no writ).
Because we have held that factually
sufficient evidence exists to support termination of J.M.'s parental rights
under family code section 161.003, we need not address J.M.'s factual
sufficiency challenges to the remaining grounds for termination found by the
trial court under section 161.001, subsections C, D, F, and O. See In
re D.M., 58 S.W.3d at 813; In re R.C., 45 S.W.3d 146, 149 (Tex.
App.--Fort Worth 2000, no pet.); In re S.F., 32 S.W.3d 318, 320 (Tex.
App.--San Antonio 2000, no pet.); see also Tex. Dep't of Human Servs. v. E.B.,
802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g). See Tex. R. App. P.
47.1.
V. Applicability of
Americans With Disabilities Act
In his sixth issue, J.M. contends
that the ADA applies to termination proceedings and that TDPRS violated the ADA
in the course of its treatment of J.M. Specifically, J.M. asserts that TDPRS
violated the ADA by failing to accommodate his mental deficiencies and provide
him with services designed for his special needs as a schizophrenic. TDPRS
responds that J.M.'s ADA complaint is in the nature of an affirmative defense
and that J.M. has waived this complaint by failing to plead it and prove it in
the trial court.
We agree with TDPRS that J.M.'s ADA
complaint is in the nature of an affirmative defense. See In re C.M.,
996 S.W.2d 269, 270 (Tex. App.--Houston [1st Dist.] 1999, no pet.). A
defendant, however, must plead, prove, and secure findings sustaining an
affirmative defense. Woods v. William M. Mercer, Inc., 769 S.W.2d 515,
517 (Tex. 1988); In re C.M., 996 S.W.2d at 270. J.M. did not plead or
prove his contention that TDPRS violated the ADA by failing to accommodate his
mental deficiencies and provide him with services designed for his special needs
as a schizophrenic. Accordingly, J.M.'s ADA complaint was waived. See
Tex. R. Civ. P. 94; In re C.M., 996 S.W.2d at 270.
J.M. nonetheless contends that,
although he failed to plead this affirmative defense, "there is no doubt
that [TDPRS] anticipated it under its pleadings by alleging termination under
the 'mental health' ground" and that he established this defense as a
matter of law at trial. J.M. relies upon Shoemake v. Fogle, Ltd., 826
S.W.2d 933, 937 (Tex. 1992), and Phillips v. Phillips, 820 S.W.2d 785,
789 (Tex. 1991), for the proposition that even if a defendant does not plead an
affirmative defense the defendant may raise the defense on appeal when the
plaintiff anticipated the defense in its pleading and the defense is established
at trial as a matter of law.
The reasoning set forth above in Phillips
and Shoemake is inapplicable to this case. The court in Phillips
held that the plaintiff's pleading that an agreement was illegal on its face
anticipated the defense of illegality. Phillips, 820 S.W.2d at 789-90.
Similarly, in Shoemake, the court concluded that "[i]f a child
sued a parent for the negligent performance of parental duties, the pleading
would effectively anticipate the defense of parental immunity." Shoemake,
826 S.W.2d at 937. Here, it cannot be said that, pleading the parent-child
relationship should be terminated under the mental health grounds found in
family code section 161.003 anticipates the defense of a possible ADA violation.
Additionally, J.M. did not offer any evidence at trial concerning what
accommodations or special services he contends should have been provided to him.
There is simply no comparison between the present facts and the situations in Phillips
and Shoemake.
We overrule J.M.'s sixth issue.
VI. Conclusion
Having overruled J.M.'s fifth and
sixth issues on appeal, and having determined that we need not address J.M.'s
first through fourth issues, we affirm the trial court's judgment.
 
                                                           
SUE WALKER
                                                           
JUSTICE
 
PANEL F: DAY, LIVINGSTON, and
WALKER, JJ.
DELIVERED: July 24, 2003

1. Dr. Sabine testified:

        
 A. The opinion that I formed was that [J.M.] has schizophrenia, paranoid type.
 This is a serious and prolonged mental illness, and that he is -- was at the
 time of this evaluation -- experiencing the rather labile symptoms of that,
 including delusional thought, loosening of associations, rambling speech,
 references to hyper-religious ideas. In a way it's difficult to describe,
 because we would be talking in a normal fashion about something that was
 rather concrete, and from time to time in the discourse he would lapse into
 discussions about metaphorical eyes or spiritual experiences that were not in
 the context of discussion about religion at all or theology; rather about
 rather mundane questions about history and so forth.

2. Dr. Sabine testified:

        
 A. It is the unpredictability of this illness that makes it such a risk; that
 even though one might effectively parent on a day or two, a month or two down
 the road one might begin a delusional process that would lead them to -- lead
 a parent to feel that their children have a conspiracy against them, or that
 one of their children are satanically inhabited and needs to be killed or -- I
 mean, I'm not saying that he ever said anything like that to me, but in the
 process of this illness, that is not uncommon for those sort of delusions to
 come up in the paranoid schizophrenic.
        
 And without his submitting for treatment and having the history of being
 treated and being willing to be treated, that raises those issues and those
 risk factors dramatically.