# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-04-00003-CV

**Mark Morales, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
NO. FM200807, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Mark Morales appeals the trial court's decree terminating his parental rights to his daughter, H.C.M., and appointing the Texas Department of Protective and Regulatory Services (the Department) permanent managing conservator of the child. Morales challenges the factual sufficiency of the evidence supporting the trial court's findings that (1) he has a mental or emotional illness or a mental deficiency that renders him unable to provide for the physical, emotional, and mental needs of H.C.M.; (2) the illness or deficiency will continue to render him unable to provide for H.C.M.'s needs until her eighteenth birthday; and (3) the Department has made reasonable efforts to return H.C.M. to her family. We find the evidence factually sufficient and affirm the decree of termination.

## BACKGROUND

When H.C.M. was born prematurely on July 13, 2002, she tested positive for cocaine, opiates, and benzodiazepines. She was immediately placed in the neo-natal intensive care unit, where she remained until she was released into foster care approximately six weeks later. Due to the presence of drugs, the Department received a priority-one referral from the hospital for physical abuse of a newborn. On July 23, 2002, the trial court granted the Department temporary managing conservatorship of H.C.M. *See* Tex. Fam. Code Ann. § 160.003(a) (West 2002).

H.C.M. experienced symptoms of narcotic withdrawal for several weeks after birth. As a result of her pre-natal drug addiction, H.C.M. suffers from grand mal seizures, insomnia, and chronic reflux. On April 11, 2003, H.C.M. was diagnosed with cerebral palsy of her lower extremities. Additionally, H.C.M. has severe asthma and delayed speech development.

H.C.M. must attend at least one doctor's appointment weekly and requires physical and occupational therapy twice weekly. H.C.M. must also wear a helmet to protect her from possible brain damage that could occur if she hit her head during a seizure. H.C.M.'s caregiver must administer breathing treatments and multiple medications twice daily. In sum, knowledgeable around-the-clock care is crucial to H.C.M.'s well-being and future quality of life.[1]

Morales, who was not married to H.C.M.'s mother, was determined to be the child's biological father through paternity tests. On October 29, 2002, he signed a Family Plan of Service with the Department caseworker, Michelle Kimbrough. Morales agreed to undergo random

---

[1] H.C.M.'s foster mother, Reba Leming, who has 19 years of experience dealing with medically needy children, stated that she could not possibly provide for H.C.M.'s needs while working outside the home.

urinalysis testing, maintain stable housing, cease criminal activity, not associate with H.C.M.'s mother[2] as long as she is using drugs, receive an assessment for anger management classes, participate in individual counseling, attend H.C.M.'s doctors' appointments, attend at least two Narcotics Anonymous meetings each week, participate in a psychological examination, attend parenting classes, and obtain the means to financially support H.C.M.[3]

In his intake interview with the Department, Morales described himself as seventy-five percent disabled due to head injuries sustained in a car accident in 1996. Morales suffers from short-term memory loss and has seizures and damaged vision. As a result, he takes phenobarbital, Zestril, and 600 mg of Dilantin daily.[4] He cannot drive, does not work, walks with a limp and has extreme difficulty reading. He also has dormant Hepatitis C, high blood pressure and diabetes. Morales lives with his natural mother and guardian, Janie Rivera. She assists him with bills, medications, doctors' appointments, and appropriate decision-making.

Dr. Mary Kilpatrick conducted a psychological evaluation of Morales based on a referral from the Department. Dr. Kilpatrick testified that Morales had mild mental retardation and anti-social and narcissistic tendencies. She stated at trial that an adult with these tendencies would

---

[2] Sarah Carpenter is H.C.M.'s natural mother. She voluntarily relinquished her parental rights to H.C.M. on September 30, 2003, and is not a party to this appeal.

[3] The portions of the Family Plan of Service compelling anger management classes and attendance at Narcotics Anonymous meetings stem from Morales's history of violent criminal behavior, gang involvement, and drug abuse.

[4] Dilantin is an anti-epileptic used to prevent seizures. Phenobarbital is a barbituate and is also used to treat seizures. Zestril is used to treat high blood pressure.

have a difficult time developing a "healthy balance between his own needs and the needs of other people." Dr. Kilpatrick concluded that Morales did not possess the resources to be able to care for a child and that, because of his low IQ and severely impaired memory, she did not recommend parenting education.

After Dr. Kilpatrick's examination of Morales, Rivera made an appointment for Morales with Dr. Kent Foster, a neuropsychologist who specializes in patients with head injuries. In his testimony, Dr. Foster asserted that Morales's IQ was on the threshold between mild and borderline mental retardation and that he found no indication of a personality disorder. He went on to state that, although the process would be long and difficult, in his opinion Morales could learn through therapy to accept his limitations. Dr. Foster recommended that Morales obtain counseling from a therapist with experience dealing with patients with brain injuries and felt that Morales could benefit from hands-on vocational training. Dr. Foster agreed that Morales would not benefit from parenting classes taught in a traditional classroom setting, but believed he could do well with practical, "how-to" instruction. Dr. Foster advised that Morales should not be a child's primary decision maker, but felt that he could participate with someone who made those decisions.

In addition to his psychological evaluations, on November 5, 2002, Morales began attending weekly counseling sessions with Jude Wick, a licensed professional counselor experienced in working with patients with brain injuries. These sessions continued for approximately six months. Wick worked with Morales on developing positive coping strategies and accepting his limitations. At trial, Wick stated that Morales made little to no progress in understanding his limitations. He also cited at least one example of Morales's tendency to become extremely agitated when discussing his

ability to provide for H.C.M.[5] Wick averred that he did not believe that Morales would be physically abusive, but admitted Morales does lack verbal restraint. Wick went on to opine that if someone were hurt being around Morales, it would likely be because he was out of control and an accident occurred. Wick concluded that Morales should not be the primary caregiver for H.C.M. and that, while he could possibly participate in her care, it would be difficult to assess how much respect Morales would have for the advice and direction of others.

On November 26, 2003, the trial court entered its decree terminating Morales's parental rights to his daughter, H.C.M. This appeal followed.

## STANDARD OF REVIEW

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982); *accord Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). The Supreme Court, in discussing the constitutional stature of parental rights, has stated, "The interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Nonetheless, while parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Just as it is imperative for courts to recognize the constitutional

---

[5] Towards the end of one session, the discussion turned to the subject of Morales's inability to be the sole provider for H.C.M. Rivera had arrived to take Morales home and overheard the discussion. Morales stated that the doctor had not said that he could not be the sole provider. Rivera disagreed and explained that the doctor had made that statement. Morales then cursed at Rivera and walked out, slamming the door so hard that it fell off the hinges.

5

underpinnings of the parent-child relationship, it is also essential not to sacrifice the emotional and physical interests of the child to preserve that right. *Id.* Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from a preponderance of the evidence to clear and convincing evidence. *Santosky*, 455 U.S. at 746; *see also In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

In applying the clear and convincing standard, we determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *In re C.H.*, 89 S.W.3d at 25. We consider whether disputed evidence is such that no reasonable fact finder could have resolved the dispute as the trial court did. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The evidence is factually insufficient if, in light of the entire record, the disputed evidence against the finding is so significant that a fact finder could not reasonably have formed such a firm belief or conviction. *Id.*

Here, the court terminated Morales's parental rights upon the judge's finding that:

(1) the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;

(2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;

(3) the Department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination;

(4) the Department has made reasonable efforts to return the child to the parent; and

(5) the termination is in the best interest of the child.

Tex. Fam. Code Ann. § 160.003(a) (West 2002). In three issues on appeal, Morales contends that the Department's evidence is factually insufficient to support the findings that (1) he has a mental deficiency that renders him unable to provide for the physical, emotional, and mental needs of H.C.M.; (2) the illness or deficiency will continue to render him unable to provide for H.C.M.'s needs until her eighteenth birthday; and (3) the Department has made reasonable efforts to return H.C.M. to her family.[6]

## DISCUSSION

Morales obviously cares deeply for his daughter. However, our analysis must focus on whether Morales's disability impairs his ability to provide for H.C.M. Upon examination of the record it is clear that a reasonable fact-finder could have formed a reasonable belief or conviction that Morales does have a mental disability that renders him unable to provide for the physical, emotional, and mental needs of H.C.M., and that the disability would continue to render him unable to provide for H.C.M. until her eighteenth birthday.

At trial, Morales conceded that he could not take care of H.C.M. by himself. In addition, all of the mental health professionals who evaluated Morales concluded that he should not be the primary caregiver for H.C.M. Both Dr. Kilpatrick and Wick concluded that Morales has difficulty accepting his limitations and that, despite his good intentions, he lacks the ability to understand and effectively deal with H.C.M.'s extensive medical needs. Dr. Foster testified that with

---

[6] Morales does not challenge the trial court's findings that the Department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination or that the termination is in the best interest of the child.

7

proper instruction and therapy Morales can learn to understand his limits and the parenting skills necessary to assist in H.C.M.'s care. He further asserted that the narcissistic and antisocial behaviors observed by Wick and Dr. Kilpatrick are a natural response to a severe injury. That is, it is only natural for Morales to focus his attention on himself after experiencing the trauma of his head injury. While that may be true, this coping mechanism may also impair his ability to parent effectively.

On cross-examination Dr. Foster admitted that Morales's extensive criminal history and previous drug and alcohol abuse concerned him and might have lowered his assessment of Morales's emotional functioning had it been disclosed. He explained that the accuracy of portions of his evaluation depended on how forthcoming Morales chose to be and that much of the criminal history had not been disclosed. Similarly, he expressed concern that Morales had not taken the opportunity to participate in a vocational training program that was offered to him. The fact that Wick felt that Morales still refused to accept his limitations after six months of therapy also concerned Dr. Foster.

Morales argues that Family Code Section 160.003(a)(1) only requires that he "provide for" H.C.M.'s needs, but not that he do so personally. He planned to provide for H.C.M.'s needs by remaining in his home and having his mother, Rivera, assist with the bulk of H.C.M.'s care. The Department's concern with this plan was Morales's presence in the home. The Department feared that Morales's mental deficiencies impaired his judgment regarding H.C.M. and that Rivera's full-time employment made it inevitable that he would be left alone with H.C.M. Even if it were possible to arrange a situation where Morales would never be left alone with H.C.M., the Department,

8

Kilpatrick, and Wick were concerned that he would not respect Rivera's authority regarding decisions affecting H.C.M.

In addition, there were questions regarding Rivera's suitability as a provider for H.C.M. Rivera did not pass a home study because the Department feared she could not protect H.C.M. from Morales and that she did not appear to fully understand the extent of H.C.M.'s needs. Rivera told the Department social worker that she planned to continue working full-time until a better arrangement could be worked out and that she was not afraid of leaving H.C.M alone with Morales. H.C.M.'s immediate and extensive needs, however, demand full-time attention. While Rivera may possess the skills to provide for H.C.M., a reasonable fact finder could conclude that she does not have the means to do so alone, while caring for both Morales and her elderly stepfather, and at the same time maintaining full-time employment.

Similarly, given the nature of Morales's disability, a reasonable fact finder could form a firm belief that his disability would continue to render him unable to provide for H.C.M. until her eighteenth birthday. Section 161.003(a)(2) only requires a showing of reasonable probability that Morales's mental deficiency will continue until H.C.M.'s eighteenth birthday. *Salas v. Texas Dep't of Protective and Regulatory Servs.*, 71 S.W.3d 783, 790 (Tex. App.—El Paso 2002, no pet.). Morales's injuries originated seven years prior to this trial. No evidence was presented that the damage caused by his head injury could be cured or reversed. Even though there was debate over how much Morales could learn and the best method for teaching him, no expert suggested that he could learn enough to be H.C.M.'s primary caregiver.

9

We conclude that the evidence is factually sufficient to support the findings that Morales has a mental disability that renders him unable to provide for H.C.M.'s physical, emotional, and mental needs and that the disability will continue to render him unable to do so until H.C.M.'s eighteenth birthday. Therefore, we overrule Morales's first and second issues.

## FAMILY REUNIFICATION

In his final issue Morales contends that the evidence is factually insufficient to support the trial court's finding that the Department made reasonable efforts to reunite him with H.C.M. as required by section 160.003(a)(4) of the Family Code. The record indicates that the Department had few options. Morales admits that he should not be the primary caregiver for H.C.M., but argues that the Department made no effort to provide him with parenting and employment training so that he could gain the skills necessary to assist Rivera with H.C.M's care. However, the evidence shows that the Department made reasonable efforts to provide parenting and employment training. Morales turned down an offer to go into a vocational rehabilitation program that would provide him a place to live and help him find a job. Kimbrough testified that Morales told her he was content with his Social Security income and did not desire a job. Kimbrough also referred Morales and Rivera to a basic parenting class, which they completed together. The Department did not recommend further parenting education because it felt that, based on Morales's psychological evaluation, he lacked the memory and comprehension level to benefit from classes offered in a traditional classroom setting. The Department also attempted to provide vocational or "how-to" parenting instruction. At trial, Kimbrough stated that she attempted to teach Morales, by

10

modeling proper parent-child interaction and how to properly hold H.C.M., place her in her car seat, and put her helmet on, but that Morales did not respond well to the instruction.

The Department contacted several family members to see if any would be willing to care for H.C.M, but they all declined after learning of her special needs. The Department's only remaining option for family reunification was to place H.C.M. in Rivera's care. Because of her additional responsibilities in caring for Morales and her elderly stepfather and her need to work outside the home, the Department concluded that placing H.C.M., with her extensive special needs, with Rivera was not reasonable. Therefore, we conclude that a fact finder could reasonably form a firm belief that under these circumstances the Department made reasonable efforts to reunite H.C.M. with her family. We overrule the third issue.

## CONCLUSION

Because we find the evidence factually sufficient to support termination, we affirm the trial court's decree of termination.

_____

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed: September 30, 2004

11