# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00415-CV

**Dana Parie, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

### FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
### NO. 21,451, HONORABLE V. MURRAY JORDAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In this case, appellant Dana Parie appeals the trial court=s final order terminating her parental rights to her son T.K.P., entered following a jury trial. We find the evidence legally and factually sufficient to support a determination that Parie engaged in conduct that endangered her child=s physical well-being and that termination is in his best interest. We affirm the district court=s order terminating Parie=s parental rights.

## BACKGROUND

At the conclusion of a trial before a jury, eleven jurors determined that Parie=s parental rights be terminated. Accordingly, the district court terminated those rights in a final decree, listing among other reasons that Parie engaged in conduct or knowingly placed T.K.P. with persons who engaged in conduct that endangered his physical or emotional well-being and that termination was in T.K.P.=s best interest.[1] Because Parie=s issues on appeal involve the legal and factual sufficiency of the evidence, we begin with a summary of the record.

Parie is twenty-seven years old and the mother of T.K.P., her only child. She receives $500 each month in social security disability payments, lives in subsidized housing, and receives some other state welfare benefits. She lives on her own and receives no financial help from family members. She has no vehicle and so needs the help of others in order to get to appointments or to perform errands outside of the home. T.K.P. was born in Llano on March 17, 2001. His father could not be located and has never provided any support for the child. Parie knew him only for about three and a half months. They never resided together and are not currently in contact.

---

[1] The district court also found both that Parie knowingly placed or knowingly allowed T.K.P. to remain in conditions or surroundings which endangered his physical or emotional well-being and that she has a mental or emotional illness or a mental deficiency that renders her unable to provide for his physical, emotional, and mental needs and will continue to render her unable to provide for his needs until his eighteenth birthday, despite at least six months of reasonable efforts to return T.K.P. to his mother.

Parie was diagnosed with low mental abilities when she was fifteen years old and receives social security benefits as a result of that diagnosis. She has completed the eleventh grade in school. According to one psychological evaluation conducted when she was twenty-six years old, Parie reads on the third-grade level and scored a composite IQ of 82.[2] Expert testimony reveals that even though Parie has borderline intellectual functioning, she Aappears to possess sufficient cognitive skills to benefit from parenting instruction and therapeutic intervention.@ She can perform basic life skills on her own, such as buying groceries, cooking, and finding an apartment through newspaper ads.

The Department received a referral for negligent supervision of T.K.P. on February 12, 2002. Molly Rivers, the Department=s investigator, visited Parie at her Housing Authority apartment in Marble Falls. Rivers reported that the apartment had trash throughout and that the floor was Acompletely covered with dirty diapers, trash, [and] food.@ Rivers estimated that forty to fifty dirty diapers were on the floor in the bedroom alone. She found other health and safety hazards, such as an electrical cord draped across the floor, a bucket of water on the floor with six to eight inches of water in it, and cat food and a litter box in the bedroom. She described T.K.P. as Afilthy@ and testified, AHis hair was greasy. He appeared not to have been bathed in several days. His clothes were dirty and stained.@

---

[2]     This IQ score means Parie functions at or above the intellectual level of about twelve percent of the general population. This score meets the criteria for a diagnosis of borderline intellectual functioning.

As a result of Rivers=s report, the Department removed T.K.P. from the home. Afterwards, Vicki Cox-Ritter, Parie=s trial attorney, a department case worker and some other women came to the apartment to help clean it. On March 15, 2002, the Department reunited T.K.P. with Parie under the condition that Parie Amaintain the house and go to parenting classes.@ It also assigned Ryan Copeland, a caseworker from Child Protective Services, to monitor the conditions at the house. On April 9, 2002, Liz Seabaugh, a volunteer from Court Appointed Special Advocates (CASA) and T.K.P.=s eventual attorney ad litem, met Parie and began coming to her house every few days. She advised Parie on how to maintain the apartment and attempted to teach her how to clean. From April to August 2002, Seabaugh met with Parie in person thirty-one times and spoke with her on numerous occasions over the phone. Parie would follow her instructions on how to sweep the floor but would then leave the dirt and trash piled on the floor rather than removing it. She tried to teach Parie how to mop, but Parie would only mop Alike my child would. She didn=t really mop the floor. She mopped at it. She swiped at it.@ When she attempted to teach Parie to clean the cabinets, she reported that Parie would follow her instructions on how to scrub with cleanser. However, she would not wipe the cleanser off the counters. On one occasion when Seabaugh went to Parie=s house, the dishes filled the sink, and the dishes and the counter were covered with old food and Aa layer of filth.@

Parie testified that in addition to Seabaugh, other employees of the Housing Authority in which she lived visited and gave her suggestions on keeping her apartment clean and safe for a child. Additionally, the Housing Authority made available a mentor and a surrogate grandmother, who was charged with helping Parie to maintain her apartment in a clean and safe manner. Parie=s aunt, Julie Sewell,

4

testified that she helped Atwo or three times a week,@ as did several cousins. Sewell also attempted to teach Parie grooming and personal hygiene habits for herself and for T.K.P. During this time period, once Parie was left to organize her house for herself, it would again fall into disorder and hazards would reappear. For example, Seabaugh testified that many times she would have to move trash out of the way to open the door of the apartment. T.K.P. tripped over objects on the floor, Parie=s medicine bottles would be on the table by the sofa, and sewing needles were within T.K.P.=s reach. During one of Seabaugh=s visits to the house, T.K.P.=s feet were black from the dirt on the floor.

While T.K.P. was living with Parie, the Department attempted to provide Parie with a variety of additional services. She was scheduled to attend parenting classes, to receive a psychological examination and two different psychiatric examinations, and was enrolled in therapy. The Department tried to provide Parie with cleaning services and explored with her the possibility of group-home living.

In August 2002, Rivers investigated Parie after another referral. She testified that the house was Aworse than it was before . . . even after we had all of these people in place to ensure that the home would be cared for.@ On August 20, Copeland removed T.K.P. a second time. He stated that the home was Ajust filthy and [T.K.P.] was filthy.@ He thought that the conditions at the house created a dangerous environment for T.K.P. In addition to the lack of cleanliness of the house, the cat litter box was easily accessible, electrical cords and lamps were in dangerous positions, and Parie=s medication was on the floor.

5

After T.K.P. was removed, the Housing Authority warned Parie to clean her house. Because she failed to comply with those directives, she was evicted in October. She moved in with Sewell for a short time. She then moved to a trailer home in Lampasas, where Seabaugh continued to visit her. She said it was dirty before Parie moved into it and Avery dirty@ after she moved in. In January 2003, Parie moved to a trailer in Granite Shoals. It could only be locked with a padlock on the outside. According to Seabaugh, Parie Ahad all the windows covered. It was very dark in there, and it was very dirty. . . . Every bit of space was covered with something. You could hardly walk in it.@ She did not think that the water in the shower worked, and there was no food in the refrigerator. By the time of trial, Parie had moved one last time to a duplex in Burnet.

During this time, the Department continued to provide Parie with services with the ultimate goal of reuniting Parie and T.K.P. However, Parie regularly missed therapy sessions and parenting classes. In October 2002, the Department changed its goal and decided to pursue an adoption plan for T.K.P. Parie attended the meeting at which the Department made this decision, and she was told that the change occurred because of her non-compliance with the service plan and because she could not keep her house clean. The Department also communicated that it would be willing to change its plan if Parie=s behavior changed.

Parie does not understand why the Department has concerns about her parenting abilities. She did not realize the consequences of leaving her apartment Acluttered.@ She had found it Acomfortable@ and did not see any dangers for T.K.P. However, she realizes that the condition of her house was not appropriate for T.K.P. She is aware that her housekeeping is less than adequate. For example, when

**6**

undergoing a psychiatric assessment she stated that the apartment Alooked like a tornado had hit [it] the day@ the Department removed T.K.P. the first time. However, she has complied with the Department=s suggestions when others have attempted to help her clean, and she demonstrated awareness of the concept of danger by removing easily breakable glass objects from T.K.P.=s reach.

At trial, Mark Walker, Parie=s parenting class instructor, testified that termination of the parent-child relationship would be in T.K.P.=s best interest. For example, he stated that Ait would take constant supervision@ to insure that Parie would be able to care for T.K.P. appropriately. He did not feel that there would be a time that Parie could be competent to meet the needs of a child. Copeland testified that Parie does not have the ability to provide Afood, clothing, shelter, a caring environment, clean living space, and, in the future, an education@ for T.K.P. Seabaugh testified that adoption was in T.K.P.=s best interest. She thought that he seemed happy when he was with his mother but that he was not making emotional and developmental progress. He was not speaking much. However, she saw much improvement when he was placed in foster care. Sewell, Parie=s aunt, thought that Parie could not provide a safe home environment for T.K.P. unless she had daily contact from the Department. When she was asked if it would be practical to return T.K.P. to Parie=s custody, she stated, A[F]rom what [Parie has] exhibited in the past, there=s just no way because of constantly having to have someone. She loves him. I know that she loves him. But it takes more than that.@ Finally, according to the Department-ordered psychological assessment, Parie Adisplays a strong bond with her son and appears to be willing to obtain necessary services to ensure their reunification.@ However, it reports that Parie Amay experience difficulties in recognizing appropriate boundaries@ with T.K.P. and cautions against reunification and unsupervised interactions.

The record contains over forty photographs of Parie=s apartment. These photographs support the testimony about its general lack of cleanliness, the large amount of trash present throughout the apartment, and the safety hazards present.

## DISCUSSION

In five issues, Parie argues that the evidence is legally and factually insufficient to show that (i) she knowingly placed or knowingly allowed T.K.P. to remain in conditions and surroundings that endangered his physical or emotional well-being; (ii) she engaged in conduct or knowingly placed T.K.P. with persons who engaged in conduct that endangered his physical or emotional well-being; (iii) she has a mental or emotional illness or mental deficiency that renders her unable to provide for T.K.P.=s physical, emotional, and mental needs; (iv) the Department made reasonable efforts to reunite T.K.P. with Parie; and (v) the termination is in T.K.P.=s best interest. *See* Tex. Fam. Code Ann. '' 161.001, .003(a) (West 2002).

A trial court may terminate a parent-child relationship if it finds that the parent has engaged in any of the conduct set out as statutory grounds for termination and that termination is in the child=s best interest; the Department must establish these elements by clear and convincing proof. *Id*. ' 161.001; *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). Clear and convincing evidence is an intermediate standard of proof falling between proof beyond a reasonable doubt and the preponderance of the evidence. *C.H.*, 89 S.W.3d at 23-25. The clear-and-convincing standard requires a Adegree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations@ supporting termination. *Id*. at 23 (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)). We review the legal

**8**

sufficiency of the evidence by considering Aall the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.@ *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must maintain appropriate deference to the fact-finder by assuming that it resolved evidentiary conflicts in favor of its finding when reasonable to do so; we disregard evidence that a reasonable fact-finder could have disbelieved or found incredible. *Id.* We review factual sufficiency by viewing all the evidence and deciding whether a reasonable fact-finder could have resolved disputed evidence in favor of its finding. *Id.* If, after such a review, the disputed evidence is such that a reasonable fact-finder could not have formed a firm belief about the truth of the State=s allegations, the evidence is factually insufficient. *Id.*; *C.H.*, 89 S.W.3d at 25.

### *Texas Family Code Section 161.001(1)(E)*

The court found by clear and convincing evidence that Parie engaged in conduct or knowingly placed T.K.P. with persons who engaged in conduct that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. ' 161.001(1)(E). On appeal, Parie argues that she corrected the cleanliness problem when it was pointed out to her by the Department and that she did not place T.K.P. with any person who engaged in conduct that endangered his physical or emotional well-being.

9

The word Aendanger@ in the context of section 161.001 of the family code means to Aexpose to loss or injury; to jeopardize.@ *Texas Dep=t of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). While endangerment under subsection (E) must be a direct result of a parental course of conduct, the conduct described does not have to be specifically directed at the child, nor does it have to cause an actual injury to the child or even constitute a concrete threat of injury to the child. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.CSan Antonio 1997, pet. denied). Rather, the statute is satisfied by showing that parental conduct simply jeopardized the child=s physical or emotional well-being. *See Director of the Dallas County Child Protective Servs. Unit v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.CDallas 1992, no writ). The parental course of conduct includes both the parent=s actions and the parent=s omissions or failures to act. *See In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.CHouston [14th Dist.] 1998, no pet.), *overruled on other grounds by In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Termination based on this subsection must be based on more than a single act or omission; a voluntary, deliberate, and conscious Acourse of conduct@ that endangered the child=s physical and emotional well-being is required. *Boyd*, 727 S.W.2d at 534.

The record in this case reflects that Parie was unable to maintain her apartment to minimum standards of cleanliness for eight months while she received continuous feedback and direction from the Department, the Housing Authority, and other persons. The floor of the apartment was covered with trash and dirty diapers, so much so that at times the front door could not be opened without moving the trash out of the way. Parie left medications, sewing needles, and electric cords within T.K.P.=s reach. She also left dirty dishes around her apartment and had the cat litter box accessible. After continued attempts to teach

10

Parie how to clean her apartment, she seemed unable to follow through with the instructions. For example, she would scrub a counter top but not wipe away the cleanser. She did not learn how to correctly mop the floor. When left without supervision or help, Parie would not clean. Evidence of this Acourse of conduct@ is legally and factually sufficient to find that Parie engaged in conduct that endangered T.K.P.=s physical well-being.

*T.K.P.=s Best Interest*

Parie also argues that the evidence is legally and factually insufficient to support a finding by clear and convincing evidence that termination is in T.K.P.=s best interest.  Some of the factors to consider in determining a child=s best interests are: the child=s wishes; his emotional and physical needs now and in the future; emotional or physical danger to the child now and in the future; the parenting abilities of the parties seeking custody; programs available to help those parties; plans for the child by the parties seeking custody; the stability of the proposed placement; the parent=s conduct indicating that the parent-child relationship is improper; and any excuses for the parent=s conduct.  *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).  Permanence is of paramount importance in considering a child=s present and future emotional and physical needs.  *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.CFort Worth 2002, pet. denied); *In re M.A.N.M.*, 75 S.W.3d 73, 77 (Tex. App.CSan Antonio 2002, no pet.); *Salas v. Texas Dep=t of Protective & Regulatory Servs.*, 71 S.W.3d 783, 792 (Tex. App.CEl Paso 2002, no pet.); *see Lehman v. Lycoming County Children=s Servs. Agency*, 458 U.S. 502, 513 (1982) (children need stable, long-term relationships with caretakers).  A fact-finder may consider the possible consequences of a decision not to terminate and may compare the parent=s and the Department=s plans for a child.  *D.O. v. Texas Dep=t of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.CAustin 1993, no writ).

A parent=s statutorily offensive conduct is often intertwined with the best-interest determination. *Horvatich v. Texas Dep=t of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.CAustin 2002, no pet.); *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.CFort Worth 2001, no pet.). Although there are cases in which the parent=s behavior alone will demand termination, generally Athe best interest determination must have a firm basis in facts standing apart from the offending behavior.@ *D.M.*, 58

**12**

S.W.3d at 814; *see Horvatich*, 78 S.W.3d at 601. The Department need not prove all nine *Holley* factors as a Acondition precedent@to termination, and the absence of some factors does not bar the fact-finder from finding by clear and convincing evidence that termination is in a child=s best interest, especially when there is undisputed evidence that the parental relationship endangered the child. *C.H.*, 89 S.W.3d at 27. No one factor is controlling, and the facts of a case may mean that evidence of one factor is sufficient to support a finding that termination is in the child=s best interest. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.CWaco 2001, no pet.).

In this case, four witnessesCParie=s parenting instructor (Walker), the Department caseworker (Copeland), the CASA volunteer who is also T.K.P.=s attorney ad litem (Seabaugh), and Parie=s aunt (Sewell)Call testified that termination of Parie=s parental rights would be in T.K.P.=s best interest. The record includes evidence that Parie was not able to maintain a clean living environment after regular and repeated attempts by the Department and others to teach her the skills to do so. In fact, the Housing Authority evicted her from her apartment because she was not able to maintain minimum standards of cleanliness. Although she realized that the condition of her house was not appropriate for T.K.P., she did not realize the consequences of keeping her apartment Acluttered.@ Since her eviction, she has failed to establish a permanent residence, and she has continued to choose to live in conditions that resemble those found in the apartment she lived in with T.K.P. She had found it Acomfortable@and did not see any dangers for her son.

In addition, Parie has not taken advantage of the help that the Department and others have attempted to provide her. She has failed to regularly attend parenting classes, and Walker terminated her

counseling sessions because of Parie=s failure to appear. She has not been able to follow the cleaning instructions that have been given to her, and she will need daily supervision in order to provide a clean and safe living situation for her son. We find this evidence legally and factually sufficient to support the court=s finding that termination of Parie=s parental rights is in T.K.P.=s best interest.

### *Parie=s First, Third, and Fourth Issues*

We have determined that the evidence in this case is legally and factually sufficient to support the district court=s conclusion that Parie engaged in conduct that endangered T.K.P.=s physical well-being and that a termination of Parie=s parental rights is in T.K.P.=s best interest. These conclusions are sufficient to support a judgment of termination. *See In re A.V. and J.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (AOnly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child=s best interest.@). Therefore, we have no need to discuss her first, third, or fourth issues, in which she challenges the district court=s conclusions that she knowingly placed or knowingly allowed T.K.P. to remain in conditions and surroundings that endangered his physical or emotional well-being; that she has a mental or emotional illness or mental deficiency that renders her unable to provide for T.K.P.=s physical, emotional, and mental needs; and that the Department made reasonable efforts to reunite T.K.P. with Parie.

### CONCLUSION

We have determined that the evidence in this case is legally and factually sufficient to support the district court=s conclusion that Parie engaged in conduct that endangered T.K.P.=s physical well-

being.  We have also determined that the evidence is legally and factually sufficient for the district court to conclude that a termination of Parie=s parental rights is in T.K.P.=s best interest.  Therefore, we affirm the order of the district court terminating Parie=s parental rights to T.K.P.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed:   July 1, 2004