# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00321-CV

**Renee Rodriguez, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
### NO. FM400611, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Renee Rodriguez appeals the district court's decree terminating her parental rights to her daughter, M.R. Rodriguez contends that the district court's record contains insufficient evidence to support its finding that (1) she is unable to provide for the physical, emotional, and mental needs of her daughter; (2) she will be unable to provide for M.R.'s needs until her eighteenth birthday; (3) the Texas Department of Family and Protective Services (the Department)[1] made reasonable efforts to return M.R. to Rodriguez; and (4) termination of her parental rights was in M.R.'s best interest. *See* Tex. Fam. Code Ann. § 161.003 (a) (West 2002). We hold that sufficient evidence supports the termination of Rodriguez's parental rights and affirm the district court's judgment.

---

[1] The Texas Department of Family and Protective Services was formerly known as the Texas Department of Protective and Regulatory Services.

**BACKGROUND**

Rodriguez is the natural mother of M.R., who was born on January 26, 2004.[2] Before M.R.'s birth, the Department had an open case involving Rodriguez, her daughter, I.R., and members of Rodriguez's extended family.[3] Based on Rodriguez's past history, the Department believed that Rodriguez would not be able to adequately parent M.R. When Rodriguez discovered that the Department intended to take M.R. from her, she made homicidal threats towards her caseworker. For this reason, Rodriguez was admitted to Austin State Hospital, where she remained for a brief stay. The Department removed M.R. and placed her in foster care on January 27, 2004, the day after she was born.

On January 28, 2004, the Department filed a petition seeking to have Rodriguez's parental rights terminated. The Department argued that Rodriguez's parental rights should be terminated on the ground that she lacked the ability to care for her daughter M.R. On April 20, 2005, trial commenced. The Department called witnesses to establish that M.R. is suffering from a number of complicated health problems, and because of these problems, the child needs close supervision and must adhere to a strict regimen of medicines and treatments. The Department also called witnesses to establish that Rodriguez is incapable of adequately parenting M.R. because she suffers from her own health problems that impair her ability to give consistent around-the-clock care.

---

[2] M.R.'s natural father is not known. A search of the Texas Paternity Registry did not reveal a father. After finding that the Department conducted a reasonable search for the unknown father, the district court also terminated the unknown father's parental rights.

[3] At the time of trial, I.R. was living with her great aunt, Susan Rodriguez. The Department and the Rodriguez family came to a negotiated agreement naming Susan Rodriguez as I.R.'s non-parent managing conservator and Rodriguez as I.R.'s possessory conservator.

Trial testimony established that M.R. has been diagnosed with the following medical conditions: (1) seizure disorder; (2) brain encephalopathy; (3) developmental delays; (4) reflux disorder; and (5) reactive airway disease. M.R. regularly visits a neurologist, a pediatrician, a gastroenterologist, and an ENT (ear, nose, and throat) doctor.

Dr. Dilip Karnick, M.R.'s pediatric neurologist, asserted that in addition to a seizure disorder, M.R. suffers from brain encephalopathy, a condition that produces delays in development. Dr. Karnick explained that his diagnosis of encephalopathy could also be classified as mild cerebral palsy. Dr. Karnick testified that he first diagnosed M.R with a seizure disorder when she was four months old, based mainly on a history of seizures reported to him by M.R.'s foster mother. Dr. Karnick testified that "strict seizure precautions" apply to M.R. He explained that these precautions include closely supervising M.R. and regularly distributing her medicine because "keeping medication level all the time is extremely important to get seizures under control." Dr. Karnick testified that, in addition to medication, mandatory care for M.R.'s seizures includes: (1) routine blood work and monitoring; (2) close monitoring in the home including maintaining a diary with entries describing the frequency of her seizures; and (3) regular follow up visits with a physician. At thirteen months, Dr. Karnick diagnosed M.R. with delays in both speech and motor development. To address her developmental delays, Dr. Karnick testified that M.R. needs ongoing therapy stimulation, physical therapy, and occupational therapy. Dr. Karnick concluded that given her current diagnosis, M.R.'s long-term prognosis possibly includes delayed development, mental retardation and learning disabilities.

M.R.'s pediatrician, Dr. Sandra Thomas, testified that in addition to developmental delays, M.R. suffers from reflux disorder and reactive airway disease. Dr. Thomas explained that M.R.'s delays in muscle development, or hypotonia, affect her reflux disorder and reactive airway disease.[4] Dr. Thomas explained that M.R. has a very difficult time eating because the reflux disorder causes her to regurgitate and subsequently aspirate her food. The reactive airway disease further compounds this problem by frustrating her breathing. Dr. Thomas asserted that because of M.R.'s hypotonia, reflux disorder and reactive airway disease, she frequently develops pneumonia.

Dr. Thomas testified that in addition to regularly administering medication, treating the reflux disorder and the reactive airway disease requires a working knowledge of each of M.R.'s medical problems. She insisted that because of the number, complexity, and severity of her medical problems, "[M.R.] needs a very high level of care."

The Department placed M.R. in Reba Lemming's foster home.[5] To assist M.R. with her breathing, Lemming must give M.R. nebulizer treatments.[6] The nebulizer treatments are designed to open M.R.'s airway, promoting easier breathing. Lemming does not administer the treatments on a regular schedule. Rather, Dr. Thomas explained, "[S]omeone has to identify right

---

[4] Dr. Thomas testified that M.R. meets regularly with a physical therapist and an occupational therapist to treat the hypotonia. Dr. Thomas stated that M.R. will require physical and occupational therapy throughout her childhood. Dr. Thomas also referred to hypotonia as cerebral palsy.

[5] Reba Lemming runs a foster home for children with special medical needs. She has been a foster parent for thirty-five years. Lemming attends fifty hours of training a year, including classes on how to deal with cerebral palsy and seizures.

[6] To administer the treatments, Lemming puts a mask on M.R. and M.R. breathes for fifteen to twenty minutes.

away that [M.R.] needs to start [the treatments] before she sees a doctor and not wait to see a physician. . . . It requires someone who is used to watching for the signs and symptoms of an exacerbation to start the nebulizer treatments." Dr. Thomas testified that the failure to recognize M.R.'s needs and thus promptly administer nebulizer treatments could be devastating. She elaborated that if M.R. cannot inhale enough oxygen, she breathes faster. And the faster M.R. breathes, the more she restricts her oxygen intake because she cannot exhale all the carbon dioxide fast enough. Dr. Thomas concluded, "[W]hen [M.R.'s] breathing fast, [she] tend[s] to tire out and [she] go[es] into respiratory distress and [she] can die, because [she is] too exhausted to continue breathing."

Lemming testified that M.R. requires a lot of attention, and that one person cannot do it alone. Lemming claimed that in addition to staff personnel who assist her with M.R.'s physical therapy, her husband, her son, and her daughter-in-law all help her care for M.R. Lemming described a good day for M.R. as one that involves: (1) administering medicine on a schedule; (2) multiple physical, occupational, and stimulation therapy treatments; (3) careful feedings that take thirty to forty-five minutes each; and (4) a lot of time holding her and comforting her. On a normal day, M.R. gets fussy four or five times a day. However, Lemming explained that on a bad day, M.R. cries all day long: "When [M.R] is really sick, she requires a lot of time. . . . [S]omeone is constantly holding her, then we wind up in the emergency room." Lemming testified that she takes M.R. to the emergency room roughly once a month for a variety of medical problems, in addition to regularly scheduled doctor appointments.

The Department argued at trial that Rodriguez has both physical and psychological problems that impair her ability to give the constant care that M.R. requires. Rodriguez testified that she suffers from grand mal seizures and must take medication daily to treat this condition. Dr. Mary Kilpatrick, a psychologist, testified that based on her psychological evaluation, Rodriguez is incapable of functioning as an independent adult and cannot adequately parent a medically needy child. Dr. Kilpatrick diagnosed Rodriguez with mild mental retardation and dependent personality disorder.[7] Dr. Kilpatrick explained that in comparison with most adults, individuals with dependent personality features have fewer innate psychological resources and coping mechanisms. Instead, they rely on others to take care of them. Individuals with dependent personality features have difficulty making independent decisions.

Dr. Kilpatrick testified that Rodriguez's low I.Q., coupled with her dependent personality disorder, causes her to be incapable of functioning as an independent adult. Dr. Kilpatrick testified that personality disorders are usually untreatable because personality features form the core of an individual. Dr. Kilpatrick explained that overcoming a dependent personality requires insight, a motivation to change, and long-term therapy. Because of her limited cognitive resources, Dr. Kilpatrick testified that Rodriguez's ability to develop the insight necessary to successfully address her dependent personality features through long-term therapy or treatment is limited. Dr. Kilpatrick concluded that it is highly unlikely that Rodriguez will alter her dependent personality and become an independent adult over the next eighteen years of M.R.'s life.

---

[7] Dr. Kilpatrick testified that Rodriguez has an I.Q. of 65, and that the accepted cutoff for mental retardation is 70.

Furthermore, Dr. Kilpatrick doubted Rodriguez's ability to respond to M.R.'s multiple medical needs. Dr. Kilpatrick testified that Rodriguez's limited cognitive abilities and dependent personality diminish her ability to understand M.R.'s complex needs and to initiate treatment when required. "[I]f [Rodriguez] need[s] to learn some type of equipment or procedure for [M.R.]'s medical needs, I would have concern about her capacity to learn and then the dependent [personality]—I think that she's accustomed to relying on other people for direction and support. And I would not feel comfortable with . . . her hav[ing] responsibility for a medically needy child."

Initially, the Department's plan for M.R. was family reunification. The Department outlined a service plan for Rodriguez, referring her to parenting classes and assigning her in-home coordinators to assist her with social services. Sharon Church, a service coordinator for Travis County Mental Health & Developmentally Disabled, provided Rodriguez with in-home counseling on her service plan and assistance with community resources. Church said that when she first began working with Rodriguez, her seizures prevented her from attending classes at Child Protective Services (CPS). On at least one occasion, Church observed Rodriguez right after she had a seizure. Another time, when Church inquired about her medication, Rodriguez told her that she was not having any problems. Church freely informed Rodriguez about M.R.'s various medical conditions. However, Church testified that, until two weeks before trial, Rodriguez denied that M.R. had any problems.

Barbara Felix, a service coordinator with Travis County Children's First Health Unit, assisted Rodriguez. Felix helped Rodriguez with various applications for social services and worked with her on parenting skills. One of Felix's duties was to assist Rodriguez with her own medical

7

needs. After discovering that Rodriguez was not taking her medication regularly, Felix provided her with a pill organizer, but Rodriguez did not begin taking her medication correctly. Ultimately, Felix concluded that Rodriguez's ability to utilize the services offered her did not improve. Moreover, Felix decided that because Rodriguez was not properly taking her medication, she was not meeting her own daily needs. Rodriguez's inability or unwillingness to maintain the medications prescribed for her own medical problems reflect negatively on her ability to meet M.R.'s more life-threatening medical needs.

Amy Slayton, Rodriguez's CPS caseworker, testified that the Department's primary concerns were Rodriguez's abilities to adequately parent and understand M.R.'s medical needs. On numerous occasions, Slayton attempted to explain M.R.'s medical conditions to Rodriguez. To help her learn about her daughter's medical needs, Slayton arranged for Rodriguez to attend M.R.'s many doctor appointments so that she could talk with M.R.'s doctors and Lemming. Slayton said that even though she gave Rodriguez advance notice, Rodriguez attended only seventy-five percent of the scheduled appointments. Rodriguez was permitted to attend supervised visits at CPS, for which she was also given advance notice. Slayton said that Rodriguez attended about sixty percent of those visits. Slayton testified that based on her interactions with Rodriguez over a one-year period, she believed that Rodriguez still had only limited understanding of M.R.'s medical needs. During her visits, Slayton observed Rodriguez interacting with M.R. Slayton explained that Rodriguez does like to hold M.R., but when she became fussy, Rodriguez frequently asked for help. Slayton elaborated that on numerous occasions, Rodriguez tried to console M.R., but then became uneasy and asked

8

Slayton or Lemming to take her. After a year of working with Rodriguez, Slayton concluded that Rodriguez is incapable of meeting M.R.'s medical needs.

The Department determined that placing M.R. in Susan Rodriguez's home was not a viable option. In addition to Rodriguez's other daughter I.R., Susan Rodriguez is currently caring for her own son. Slayton testified that the Department ascertained that Susan Rodriguez would not be able to take care of a medically needy child like M.R. Slayton said that the Department determined that there were no other family members with whom M.R. could be placed. No evidence was presented at trial supporting the position that Rodriguez's mother would be capable of caring for M.R. Lemming indicated that Rodriguez's mother refused to believe a doctor's diagnosis of M.R.'s medical conditions. Furthermore, the Department determined that Rodriguez was failing to meet her own medical needs while living with her mother. At trial, Rodriguez testified that she relied on her mother to remind her to take her nightly dosage. The Department determined that this reliance was unsatisfactory as Rodriguez has failed to take her medication properly. Based on her own observations of Rodriguez and progress reports from the other service providers, Slayton testified that the Department had made reasonable attempts to return M.R. to Rodriguez or a family member.

After the Department saw little progress from the services outlined in Rodriguez's plan, the plan changed from reunification to adoption. Slayton explained that although Rodriguez did attend parenting classes and visits, the Department concluded that Rodriguez did not "demonstrate any of the abilities that she may have learned in the classes or in-home services." The Department determined that Rodriguez could not adequately parent M.R.

9

Rodriguez testified that she is in a position to adequately parent her daughter, and that she plans to continue to live with her mother, who will assist her in caring for M.R. In support of her position, Rodriguez testified to measures she has taken to provide a safe home for her daughter. Because Rodriguez thought her boyfriend's behavior was not good for M.R., she asked him to move out and broke off her relationship with him. She explained, " I felt that I was . . . to get the baby back, I felt that was bad for the baby, because I heard that she got asthma and I know that that was going to be a bad society [sic] for him to be drinking and smoking cigarettes around her." Rodriguez testified that she has completed four parenting classes, and that she learned "[h]ow to bond with [her] children . . . and how to listen to them when they have a problem . . . and always be there for them, and if they need medical needs just take them to the doctor." Rodriguez stated further that she visited M.R. as often as she could. Rodriguez also explained that she prepared for her daughter's arrival by moving a baby's crib into her bedroom and installing child-proof covers on the electrical outlets.

On April 21, 2005, the district court ordered that Rodriguez's parental rights be terminated.

## STANDARD OF REVIEW

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982); *accord Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). The Supreme Court, in discussing the constitutional stature of parental rights, has stated, "The interest of parents in the care, custody, and control of their children—is perhaps the oldest of the

fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Nonetheless, while parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential not to sacrifice the emotional and physical interests of the child to preserve that right. *Id*. Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from a preponderance of the evidence to clear and convincing evidence. *Santosky*, 455 U.S. at 748; see also *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

In applying the clear and convincing standard, we determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *In re C.H.*, 89 S.W.3d at 25. We consider whether disputed evidence is such that no reasonable fact finder could have resolved the dispute as the trial court did. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The evidence is factually insufficient if, in light of the entire record, the disputed evidence against the finding is so significant that a fact finder could not reasonably have formed such a firm belief or conviction. *Id*.

## DISCUSSION

Here, the court terminated Rodriguez's parental rights upon the judge's finding that: (1) the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child; (2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the child's eighteenth birthday; (3) the

11

Department has been the temporary managing conservator of the child for at least six months preceding the date of the hearing on termination; (4) the Department has made reasonable efforts to return the child to the parent; and (5) the termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.003(a).

In four issues on appeal, Rodriguez contends that the Department's evidence is factually insufficient to support the findings that (1) she has a mental deficiency that renders her unable to provide for the physical, emotional, and mental needs of M.R.; (2) the illness or deficiency will continue to render her unable to provide for M.R.'s needs until her eighteenth birthday; (3) the Department has made reasonable efforts to return M.R. to her family; and (4) termination of her parental rights was in M.R.'s best interest.[8]

**Rodriguez's Mental Disability**

Rodriguez clearly loves her daughter and wishes to care for her. However, our analysis must focus on whether Rodriguez's disability impairs her ability to provide for M.R. Upon examination of the record, it is clear that a reasonable fact finder could have formed a reasonable belief or conviction that Rodriguez does have a mental disability that renders her unable to provide for M.R.'s physical, emotional, and mental needs, and that the disability would continue to render her unable to provide for M.R. until her eighteenth birthday. *See J.F.C.*, 96 S.W.3d at 266.

---

[8] Rodriguez does not challenge the district court's findings that the Department has been M.R.'s managing conservator for at least six months preceding the date of the hearing on the termination.

Testimony from medical experts established that M.R. is a medically fragile child who needs a high level of care. At trial, Rodriguez explained that she would continue living with her mother, who would help her care for M.R. However, evidence indicates that Rodriguez is not meeting her own medical needs while living with her mother. Rodriguez testified that her mother sometimes reminds her to take her medicine. However, Felix testified that Rodriguez was not taking her medicine regularly. Even after Felix and Rodriguez discussed the importance of taking medication correctly, Rodriguez did not change her behavior.

In addition, Slayton and Dr. Kilpatrick testified that they believed that Rodriguez had a limited understanding of M.R.'s medical conditions and that Rodriguez could not adequately care for her. Dr. Kilpatrick concluded that because of her low I.Q. and dependent personality, Rodriguez lacks the ability to understand and effectively deal with M.R.'s extensive medical needs. Slayton asserted that although Rodriguez did complete and receive certification in various parenting classes and visit with M.R., she did not demonstrate what she had learned through the services that the Department had provided to her. Furthermore, from their observations of Rodriguez's interactions with M.R. over a whole year, Slayton and Lemming testified that they believed Rodriguez is incapable of meeting M.R.'s medical needs.

Section 161.003(a)(2) only requires a showing of reasonable probability that Rodriguez's mental deficiency will continue until M.R.'s eighteenth birthday. *Salas v. Texas Dep't of Protective & Regulatory Servs.*, 71 S.W.3d 783, 790 (Tex. App.—El Paso 2002, no pet.). Reasonable probability does not mean beyond a reasonable doubt. *In re B.L.M.*, 114 S.W.3d 641, 648 (Tex. App.—Fort Worth 2003, no pet.). Dr. Kilpatrick asserted that because of the compound

13

effects of Rodriguez's low IQ and dependent personality, it is unlikely that Rodriguez will become able to independently and adequately parent M.R. in the next eighteen years. We conclude that the evidence is factually sufficient to support the findings that Rodriguez has a mental disability that renders her unable to provide for M.R.'s complex physical, emotional, and mental needs and that the disability will continue to render her unable to do so until M.R.'s eighteenth birthday. Therefore, we overrule Rodriguez's first and second issues.

**Family Reunification**

In her third issue, Rodriguez contends that the evidence is factually insufficient to support the trial court's finding that the Department made reasonable efforts to reunite her with M.R. as required by section 161.003(a)(4) of the family code. Initially, the Department's plan for M.R. was reunification. The record indicates that the Department made efforts to provide Rodriguez with parenting training, assistance with her own medical needs, and information about community services. On numerous occasions, Slayton has attempted to explain M.R.'s medical conditions to Rodriguez. The Department notified Rodriguez about M.R.'s doctor appointments so that she could become familiar with M.R.'s medical needs. However, Slayton testified that after a year of working with Rodriguez to improve her ability to care for M.R., the Department determined that Rodriguez did not show any significant improvement. The Department felt that Rodriguez did not demonstrate any of the abilities she may have learned in the parenting classes or in-home services that would indicate any significant changes in her ability to parent M.R. Furthermore, the Department determined that neither Susan Rodriguez nor the grandmother Mary Louise Rodriguez was a suitable adoptive parent for M.R. Since Rodriguez is not meeting her own medical needs while living in her

14

mother's home, it is likely that her mother would be unable to take on the additional responsibility of taking care of a frail child who requires around-the-clock care. We conclude that a fact finder could reasonably form a firm belief that under these circumstances, the Department made reasonable efforts to reunite M.R. with her family. We overrule the third issue.

**Termination is in M.R.'s Best Interest**

In her fourth issue, Rodriguez contends that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights is in M.R.'s best interest. Both Dr. Thomas and Dr. Karnick testified that M.R. is a medically fragile child who will need ongoing medical and therapeutic treatment. Testimony from Church revealed that Rodriguez has resisted accepting M.R.'s diagnoses. Slayton and Dr. Kilpatrick testified that Rodriguez has a limited understanding of M.R.'s medical conditions and cannot adequately care for her. Lemming, a foster mother with thirty-five years of experience, attested that M.R. needs a great deal of attention and that Lemming could not care for her alone but must rely on help from her husband, son, daughter-in-law, and a trained staff member. In addition, M.R.'s doctors testified that the severity of her conditions can accelerate rapidly and that whoever is caring for M.R. must recognize signs that she is in distress and immediately administer appropriate treatment. Dr. Thomas testified that frequently M.R. cannot wait to see a physician; sometimes it is critical that M.R. receive a nebulizer treatment at home. In light of all the evidence, the district court determined that Rodriguez is unable to meet M.R.'s needs and that termination was in M.R.'s best interest. We conclude that the evidence is factually sufficient to support the district court's finding that termination was in the best interest of M.R. We overrule the fourth issue.

15

**CONCLUSION**

Having overruled all of appellant's issues, we affirm the district court's termination of Rodriguez's parental rights to M.R.

                                                  _____

                                                  Bea Ann Smith, Justice

Before Justices B. A. Smith, Patterson and Puryear

Affirmed

Filed:   May 19, 2006