# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-12-00495-CV

---

**W. C. and L. H., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. D-1-FM-11-000261, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Following a jury trial, the trial court rendered judgment terminating L.H.'s parental rights to her three children, C.H., R.H., and G.H. The trial court also rendered judgment terminating W.C.'s parental rights to C.H. and R.H., his two children with L.H. The jury found that L.H. knowingly placed or allowed the children to be placed or remain in conditions that endangered their physical and emotional well being and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well being. *See* Tex. Fam. Code Ann. §§ 161.001(1)(D), (E) (West Supp. 2012). The jury also found that L.H. has a mental or emotional illness or mental deficiency that renders her unable to provide for her children's physical, emotional, and mental needs. *See id.* § 161.003 (West 2008). With respect to W.C., the jury found that he knowingly placed or allowed C.H. and R.H. to be placed or remain in conditions that endangered their physical and emotional well being and engaged in conduct or knowingly placed

C.H. and R.H. with persons who engaged in conduct that endangered their physical or emotional well being. *See id.* §§ 161.001(1)(D), (E). The jury also found that W.C. constructively abandoned C.H. and R.H, *see id.* § 161.001(1)(N) (West Supp. 2012), and failed to comply with a court order establishing actions necessary for reunification. *Id.* § 161.001(O) (West Supp. 2012). The jury found that termination of both L.H.'s and W.C.'s parental rights was in the best interest of the children. *See id.* § 161.001(2) (West Supp. 2012). W.C. and L.H. both appealed the trial court's order terminating their respective parental rights, challenging the sufficiency of the evidence supporting a number of the jury's findings. W.C. also complained of the trial court's admission of evidence of events occurring before entry of an agreed order in 2008, relying on family code section 161.004. *See id.* § 161.004(b) (West 2008) (addressing circumstances under which court may consider evidence presented at previous hearing in suit for termination of parent-child relationship). Pursuant to the jury's findings, the trial court rendered judgment terminating L.H.'s and W.C.'s parental rights. We will affirm.

**BACKGROUND**

The Texas Department of Family and Protective Services ("the Department") filed an original petition seeking to terminate L.H.'s parental rights to her children C.H., R.H., and G.H and to terminate W.C.'s parental rights to his children C.H. and R.H. The case was tried to a jury in a proceeding lasting nine days. Throughout the trial, the jury heard testimony from a number of witnesses regarding the circumstances surrounding the children's removal from their parents and the events driving the Department's decision to seek to terminate the parental rights. We will discuss the factual background in more detail in our discussion of L.H.'s and W.C.'s appellate complaints.

2

At the conclusion of the trial, the jury found several predicate grounds for terminating L.H.'s and W.C.'s parental rights to their children and that termination was in the children's best interest. The trial court rendered judgment on the jury's verdict and terminated L.H.'s parental rights to C.H., R.H., and G.H. and W.C.'s parental rights to C.H. and R.H. This appeal followed.

## DISCUSSION

### *Termination of L.H.'s Parental Rights*

Numerous witnesses testified over the course of nine days regarding whether there were grounds to terminate L.H.'s parental rights to her three children. In her first issue, L.H. challenges the legal and factual sufficiency of the evidence supporting the jury's findings that there were grounds for termination. Rather than summarize the entirety of the lengthy testimony presented at trial, we begin by reviewing the sufficiency of the evidence supporting the jury's finding that L.H. suffered from a mental condition that rendered her unable to care for the mental, physical, and emotional needs of her children.

Family code section 161.003(a) provides:

(a) The court may order termination of the parent-child relationship in a suit filed by [the Department] if the court finds that:

(1)     the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child.;

(2)     the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;

3

(3)    the Department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination held in accordance with Subsection (c);

(4)    the Department has made reasonable efforts to return the child to the parent; and

(5)    the termination is in the best interest of the child.

Fam. Code § 161.003(a). In an appeal from the termination of parental rights, legal and factual insufficiency points require a heightened standard of review. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In reviewing the legal sufficiency, we view all the evidence in the light most favorable to the finding to determine whether a trier of fact could reasonably have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.L.*, 163 S.W.3d 79, 84-85 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d at 265-66. We do not, however, disregard undisputed evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing. *Id.* We must consider the disputed evidence and determine whether a reasonable fact-finder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

In this appeal, L.H. contends that the evidence is both legally and factually insufficient to terminate her parental rights pursuant to section 161.003. Specifically, she argues that there was insufficient evidence that L.H. could not meet the children's mental, physical,

and emotional needs and that this inability would continue until the children's 18th birthday. We disagree.

To support termination under section 161.003, the Department must prove by clear and convincing evidence that the parent suffers from a mental illness or deficiency and that such mental illness or deficiency will, in all reasonable probability, render the parent unable to provide for the child's needs until the child is eighteen years old. *See* Fam. Code § 161.003(a)(1), (2). The statute contemplates that the Department demonstrate a "global failure of the parent to meet the needs of the children." *In re A.L.M.*, 300 S.W.3d 914, 920 (Tex. App.—Texarkana 2009, no pet.).

At trial, Dr. Elizabeth Levy, a licensed clinical psychologist, conducted a psychological evaluation of L.H. Levy testified that L.H. displayed active paranoid ideation during the evaluation and voiced a number of fairly concrete paranoid delusions. Among other things, L.H. stated her belief that W.C. was sleeping with multiple of her family members, both male and female, as well as with her attorney. She stated that she did not take her medications because she did not believe the diagnosis of schizophrenia was correct. L.H. also recounted a history of assaultive behavior, public intoxication, and domestic violence. L.H. acknowledged that she had a history of cocaine and marijuana use, depression, suicidal ideation at an early age, and noncompliance with her medication regimen. Levy diagnosed L.H. with paranoid schizophrenia and paranoid personality disorder. According to Levy, the prognosis for paranoid personality disorder is very poor because the affected person tends not to believe that there is anything wrong with her and, in addition to pervasive suspiciousness of the motives of other people, tends to be resistant to treatment and to not engage in the therapeutic process. Levy stated her belief that L.H.'s condition rendered her unable

5

to provide for the emotional, physical, and mental needs of a child. Levy cited as an example L.H.'s aggression towards others that resulted in an arrest for domestic violence while her children were present. Levy also concluded that L.H.'s deficiencies as a parent would continue to render her unable to provide for the children's needs until their 18th birthday based on L.H.'s behavior indicating that she was denying her diagnosis and did not believe she needed treatment. Levy testified it was unlikely that L.H. would take her medication or engage in any treatments necessary to resolve her mental issues.

L.H.'s trial testimony suggests that Levy's concerns were not unfounded. L.H. testified that she believed her previous attorney was conspiring with the Department to take her children. When asked about numerous statements she was reported to have made to various individuals involved in the case, including caseworkers and law enforcement officers, she denied making any of those statements and said that people were reporting that she said things in order to "build a case" against her. When asked whether she believed that she had schizophrenia, L.H. responded: "No, I do not, but I still take the meds on the condition that I get better to y'all and I also get a disability check." She further testified that any mental illness she suffers from is caused by "triggers," such as the Department's trying to "take her kids," and that once those triggers are gone, her mental illness will be diminished. According to L.H., mental illness "does not last a long time," and she does not believe her mental condition had any effect on her children. L.H. acknowledged that she had accused her aunt of having a sexual relationship with W.C. There was also testimony regarding her tumultuous relationships with W.C. and others, which included numerous incidents of violent, uncontrolled, and aggressive behavior. She denied telling a caseworker that for a period

6

of time she drank a fifth of vodka every day, and she testified that this and other negative information about her contained in her case file was simply the Department trying to "set her up."

On the positive side, L.H. has recently been taking her medications, and she testified that she did so not just because of this case, but to diminish the symptoms of being a "paranoid schizophrenic." She also stated that she did not know how long she would need to take the medication. She testified that she no longer drinks alcohol and has tested negative for alcohol and drugs throughout the pendency of this case. L.H. has a supportive family, including a grandmother who has assisted her in caring for her children and has supervised L.H.'s visits with her children. L.H. has not missed any visits with her children and testified that she never spanks them. She stated that she understood that the children needed therapy and expressed a commitment to ensure that they continued to see a therapist. A Department caseworker testified that the children appear to be bonded to their mother and have never exhibited any fear of her.

Terry Cooper, a conservatorship caseworker employed by the Department, testified that L.H.'s mental illness and failure to treat that mental illness created situations and an environment that threatened C.H. and R.H. and G.H.'s safety. Cooper stated that even when taking her medications, L.H. demonstrated low cognitive abilities. In Cooper's opinion, even though L.H. has completed all the services the Department asked her to do, she had not displayed a pattern of behavior that indicated she had the competence or stability to care for three young children. He expressed specific concern regarding L.H.'s pattern of choosing inappropriate partners and allowing herself to be in situations of domestic violence and substance abuse. He also stated that L.H.'s explanation of her plans for the children upon reunification were very simplistic and limited,

indicating to him an inability to adequately meet parental responsibilities. Cooper stated that while in his opinion L.H. clearly loves her children and enjoys being with them, her behavior is more that of a "playmate" than a parent capable of effectively "redirecting" the children's behavior, creating an environment where the children have limits and boundaries, and engaging in age-appropriate activities with them. Cooper further testified that if unmedicated, a psychotic person can create behaviors such as domestic violence, which puts children at risk.

Michael Ferrara, a licensed clinical psychologist, testified that when someone experiences a psychotic episode or schizophrenic break, they "forget who they are, where they are, what they should be doing" and that they can "lose track of time, forget what day of the week it is, forget what year or century they are in," and generally "lose contact with reality."

L.H.'s mother, Fannie Harrell, testified that L.H.'s mental illness began to manifest itself when she was a teenager. She related instances in which L.H.'s mental condition manifested itself in paranoid and neglectful behavior. For example, Harrell acknowledged that on one occasion L.H. accused her of conspiring with the Department to remove her children. Harrell also testified that one night in 2007 when C.H. was 13 or 14 months old and R.H. was a few weeks old, Harrell and her husband took L.H. to their house from the apartment in which she was living because it was cold and they did not want L.H. to take the children outside. L.H. was angry that her mother would not let her go out, and after Harrell went to bed, L.H. left the house. Before she left she had taken the batteries out of Harrell's cell phone to prevent her from calling the police. According to Harrell, L.H. went back to her own apartment, had an altercation with her neighbor, and was later arrested

8

for public intoxication.[1]  Harrell also testified that L.H. often fought physically with her sister and recounted one instance in which she and her husband had to separate them.  Harrell was also present when L.H. had a physical confrontation with her grandmother.  Harrell also stated that L.H. usually comes to visit her when she thinks her mother has food she can eat, and that she sleeps a lot "from depression."  Harrell also testified about L.H.'s being admitted to the Austin State Hospital for psychiatric treatment immediately after G.H. was born.

Dr. Carmen Zegarra, a psychiatrist with Austin Travis County Integral Care, also testified regarding L.H.'s mental health issues.  Zegarra saw L.H. when she was pregnant with G.H.  At that time L.H. was psychotic and was hearing voices telling her to kill herself.  Zegarra confirmed that L.H. had been diagnosed with paranoid schizophrenia, which can cause delusions, false beliefs, and disorganized behavior.  Zegarra testified that L.H. responded well to medication.  Zegarra acknowledged that L.H. had a history of going off her medications, but stated that she thought L.H. was taking them at the time of trial.  She had been coming in for a shot but is presently supposed to be taking her medications orally.  Zegarra did testify, however, that after her hospitalization at Austin State Hospital following G.H.'s birth, L.H. denied her psychosis and did not take her medications.

Mental illness of a parent is not, in and of itself, grounds for termination of the parent-child relationship.  *See Carter v. Dallas Cnty. Child Welfare Unit*, 532 S.W.2d 140, 141-42 (Tex. Civ. App.—Dallas 1975, no writ).  The issue is whether L.H.'s mental illness renders her unable to provide for C.H., R.H., and G.H. until their 18th birthday.  *See* Fam. Code § 161.003(a)(2);

---

[1]  This incident is what caused the Department to remove C.H. and R.H. and place them in foster care the first time.

*Salas v. Texas Dep't of Protective & Regulatory Servs.*, 71 S.W.3d 783, 790 (Tex. App.—El Paso 2002, no pet.). The Department was not required to prove with certainty that L.H.'s mental condition will continue to render her unable to provide for the children's needs until their 18th birthday; rather, the Department was required to show, by clear and convincing evidence, that the mental illness in all probability will do so. *See* Fam. Code § 161.003(a)(1); *Salas*, 71 S.W.3d at 790; *In the Interest of C.D. & B.P.*, 962 S.W.2d 145, 148 (Tex. App.—Fort Worth 1998, no pet.).

There was evidence presented at trial that L.H. has suffered from serious mental health problems since her teens. Her mental illness has forced her to be hospitalized on at least one occasion, and she has a history of noncompliance with taking her medication. Her trial testimony reveals a pattern of denial regarding the seriousness of her condition and a lack of commitment to taking her medications in the future. There was evidence presented that L.H.'s condition would not resolve itself over time and that, if unmedicated, she would not be able to provide for her children's mental, emotional, and physical needs on a day-to-day basis. Viewing the evidence in the required light for a legal sufficiency challenge, we conclude that a reasonable jury could have formed a firm belief or conviction that L.H.'s mental condition renders her unable to provide for C.H., R.H. and G.H.'s needs and that that condition would continue to render her unable to provide for their needs until their 18th birthday. The evidence was therefore legally sufficient to support the jury's finding. Although there was evidence that L.H. had been taking her medications recently and that when medicated she did care for her children, that the children are bonded to her, and that L.H. has not missed any opportunities to visit her children and has performed the services recommended by the Department, viewing the evidence as a whole we conclude that a reasonable fact-finder could have

10

resolved any conflict in the evidence of whether L.H.'s mental condition rendered her incapable of caring for her children's needs until their 18th birthday. In light of the entire record, we hold that the evidence was factually sufficient to support the jury's finding.

Our conclusions in this regard are consistent with other cases both in this Court and other courts of appeals addressing this issue. *See, e.g.*, *Liu v. Department of Family & Protective Servs.*, 273 S.W.3d 785 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (terminating rights of mother who suffered from schizophrenia, repeatedly refused to take her medicine, was hospitalized several times and repeatedly engaged in inappropriate and violent behavior); *In re B.G.S.*, No. 04-06-00562-CV, 2007 WL 1341401 (Tex. App.—San Antonio May 9, 2007, pet. denied) (terminating rights of parent who refused to follow advice of clinical psychologist and to take medication for bipolar condition); *Spurlock v. Texas Dep't of Family & Protective Servs.*, 904 S.W.2d 152 (Tex. App.—Austin 1995, pet. denied) (terminating parental rights of parent who suffered from mental health problems that resulted in hospitalization with history of noncompliance with medication); *see also Sawyer v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-02-00286-CV, 2003 WL 549216 (Tex. App.—Austin Feb. 27, 2003, no pet.) (holding evidence supported finding that mother constructively abandoned her children when she failed to take prescribed medications for her mental health condition that were necessary for her be able to handle responsibilities of parenthood). We overrule L.H.'s first appellate issue.

In her second issue, L.H. challenges the legal and factual sufficiency of the jury's finding that termination of L.H.'s parental rights is in the best interests of C.H., R.H., and G.H. In *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), the supreme court held that a number of factors may

be examined in ascertaining the best interest of a child: (1) the child's desires, (2) the child's present and future physical and emotional needs, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the person seeking custody, (5) the programs available to assist these individuals in promoting the child's best interest, (6) plans for the child by these individuals or the agency seeking custody, (7) the stability of the home or proposed placement, (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Id.* at 371-72; *see also In re E.N.C.*, 2012 WL 4840710, at *8 (Tex. 2012). After consideration of the factors set out in *Holley* and the evidence presented to the jury, we conclude that the evidence is legally and factually sufficient to support the jury's finding that the best interest of the children will be served by terminating L.H.'s parental rights.

As we have already determined, there is legally and factually sufficient evidence that L.H. cannot meet the day-to-day needs of her three small children when she is not taking her medications and there was evidence that L.H. does not fully appreciate that she has a mental illness. She has a history of not taking her medication, and the jury could infer from her own testimony that she is likely to stop taking her medication in the future. The children are in foster care and will need to remain there in light of the reasonable probability that L.H. is unable to manage her mental illness. There was evidence that her condition will not improve over time. The children's foster mother testified that the children are doing well, that she loves them, and that she would consider adopting them if parental rights were terminated. This evidence is legally sufficient to support the jury's finding that termination is in the best interest of the children.

12

Although there was evidence that the children love their mother, there was also evidence that the children are bonded with their foster mother. While L.H.'s therapist testified that she has made progress and there was evidence that she has been capable of caring for her children in the past, there was also evidence that these periods were interrupted by episodes of violent, erratic behavior requiring others to step in and care for the children. While L.H. asserts that the children will be harmed by not being able to see her or their other family members, the foster mother testified that she would be open to permitting contact between them and the children. Balancing the evidence, particularly the specter that L.H.'s mental condition could result in virtually permanent foster placement at best and neglect or physical harm at worst, we conclude that the evidence is factually sufficient to support the jury's finding that termination was in the children's best interest. We overrule L.H.'s second appellate issue.

### Termination of W.C.'s Parental Rights

The jury found that W.C. knowingly placed or allowed C.H. and R.H. to be placed or remain in conditions that endangered their physical and emotional well being and engaged in conduct or knowingly placed C.H. and R.H. with persons who engaged in conduct that endangered their physical or emotional well being. *See* Fam. Code. §§ 161.001(1)(D), (E). The jury also found that W.C. constructively abandoned C.H. and R.H, *see id.* § 161.001(1)(N) (West Supp. 2012), and failed to comply with a court order establishing actions necessary for reunification. *Id.* § 161.001(O) (West Supp. 2012). On appeal, W.C. challenges the legal sufficiency of the evidence supporting these findings and the factual sufficiency of the evidence supporting the jury's finding that termination was in the best interest of the children; he also brings an issue complaining of the trial

13

court's admission of evidence from the time period before November 3, 2008, the date the court previously signed a decree of conservatorship.

We will first address W.C.'s third issue, in which he contends the trial court erred in admitting evidence of events that occurred before November 3, 2008, the date the court previously signed an order naming W.C. conservator of C.H. and R.H. W.C. relies on family code section 161.004, which provides in pertinent part:

> At a hearing under this section [i.e. a hearing to terminate the parent-child relationship held after rendition of a previous order denying such termination], the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child.

Fam. Code § 161.004(b) (West 2008). W.C. asserts that the November 3, 2008 order did not deny termination of parental rights, but rather appointed him the children's conservator. The Department counters that while the order did appoint W.C. conservator, it also contained language reciting that "all relief not specifically granted herein is denied." The Department's petition had also sought termination. The Department argues that because the pleadings filed in the proceeding leading to the November 2008 order included a request that W.C.'s parental rights be terminated, the order effectively denied termination of the parent-child relationship such that section 161.004 permitted the court to consider evidence presented at the previous hearing. We agree with the Department.

In an event, W.C. waived any complaint about the admission of this evidence by failing to object at trial. To preserve error for appeal, W.C. was required to make a timely, specific objection at the earliest possible opportunity. Tex. R. App. P. 33.1. Failure to object in a timely and specific manner during trial waives complaints about the admissibility of evidence. *Atlantic*

14

*Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 421 (Tex. App.—Houston [14th Dist.] 1991, writ denied). None of the evidence about which W.C. now complains was objected to at trial. W.C.'s brief cites no record references reflecting that his attorney lodged any objections when the testimony was elicited. By failing to object to the evidence at trial, W.C. failed to preserve his complaint concerning its admission. Tex. R. App. P. 33.1.

In his brief, W.C. asserts that he filed a motion in limine seeking to prevent the introduction of the evidence, which was overruled by the trial court. W.C.'s objection to the admission of evidence in the form of a motion in limine does not preserve error for appellate review. *See Houston v. Ludwick*, No. 12-09-00600-CV, 2010 WL 4132215, at *10 (Tex. App.—Houston [14th Dist.] Oct. 21, 2010, pet. denied) (mem. op.). A motion in limine is a pretrial device that permits a party to identify certain evidentiary rulings the trial court may be asked to make. *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 90 (Tex. App.—Houston [14th Dist.] 2004, no pet). A trial court's ruling on a motion in limine preserves nothing for review, and to preserve error W.C. was still required to object when the evidence was offered at trial. *Houston*, 2010 WL 4132215, at *10. We overrule W.C.'s third appellate issue.

We now consider W.C.'s legal sufficiency challenge to the jury's endangerment findings. The evidence presented at trial was that the Department was contacted on January 11, 2011, and told that W.C. had left C.H. and R.H. with Dawn Espinosa, a person he did not know well, for an extended period of time, that Espinosa did not have any documentation that would allow her to seek medical attention for the children if necessary, and that the children had dirty clothes and matted hair and appeared to be neglected. The referral also included allegations

15

that W.C. was abusing drugs. Kathy Kleen, a Department caseworker, investigated and reported that she was concerned about the children's remaining with Espinosa because they needed medical treatment for ringworm and Espinosa did not have any documentation that would permit her to obtain treatment. Kleen was also concerned because C.H. reported that she had been burned with a hot comb. On January 12 the Department also received a call from a law enforcement officer who reported that he had been told that the children had made allegations of sexual abuse. The Department contacted W.C. about the need for alternative placement for the children. According to the Department, W.C. stated that he did not want to have any contact with the Department and would not cooperate in any way without an attorney present. The Department then removed the children from Espinosa's care and took them to the Center for Child Protection, an agency separate from the Department with expertise in conducting forensic interviews. According to the Department, during an interview conducted by the Center, R.H. made an outcry that W.C. had sexually abused her.

Michael Ferrara, a licensed clinical psychologist, testified regarding his psychosexual evaluation of W.C. The purpose of the evaluation was to attempt to prove or disprove the allegations that W.C. had sexually abused R.H. Ferrara stated that W.C. had antisocial traits and that the testing revealed him to be deceptive, which caused him to not rely on W.C.'s statement that the children had been coached to make an outcry against him. According to Ferrara, the testing revealed that W.C. had "criminal personality traits." Ferrara reviewed the records and saw nothing about the way the interview of R.H. was conducted that would cause a false outcry. He did, however, note that her age at the time of the outcry would make it more likely that the child was coached than if she were older.

16

Ferrara concluded that there was nothing in the evaluation that could either prove or disprove the truth of the sexual abuse allegations.

Terry Cooper testified that he has reviewed the case file in detail, and the notes from R.H. and C.H.'s therapy sessions indicate that they have continually exhibited sexualized behavior, made sexualized comments, and discussed violence in the home. Cooper stated that, based on his review of the record, W.C. knowingly placed or allowed C.H. and R.H. to remain in conditions or surroundings that endangered their physical or emotional well-being.

Katherine Granberry, a licensed professional counselor, worked with both C.H. and R.H. She testified that during one of her early sessions with R.H., the child stated that her father touched her vagina. Granberry also stated that when R.H. played with dolls in her office she put them on top of each other and said they were kissing, and engaged in other play that Granberry felt was inappropriately sexualized for a child of her age. When asked, R.H. said that she had seen L.H. and W.C. doing that and that she had seen her dad naked with her mom. During other sessions, C.H. stated that her father had engaged in sex acts in her room with another woman. Granberry was convinced by their behavior that the girls had been exposed to adult sex.

W.C. testified that although he believed L.H. to be mentally ill, he let C.H. and R.H. stay with her anyway because "she had a lot of family members around." W.C. testified that he and L.H. fought physically on numerous occasions and that L.H. spit in his face and threw a tricycle through his living room window. Nevertheless, W.C. testified that he believed the children were safe with L.H. W.C. testified that he left his children with Dawn Espinosa, even though he didn't know her well, because "she had him fooled." He stated that he was unaware that she had been arrested

17

for murder in another state. After C.H. and R.H. were removed from Espinosa's care, W.C. moved to Stephenville, where he lived for 18 months. He stated that he has not seen C.H. or R.H. since they were removed and he quit cooperating with the Department a year later. W.C. testified that he is currently unemployed and living with his girlfriend of three months but that he would "break up with her" and move to a house if he were to obtain custody of C.H. and R.H.

Dr. Elizabeth Levy, a licensed clinical psychologist, evaluated C.H. and R.H. in April 2011. Levy testified that C.H. showed poor interpersonal boundaries and expressed anxiety about being alone with W.C. Levy diagnosed C.H. with adjustment disorder with anxiety and depression. Levy believed that C.H. had impaired emotional function caused by the "chaotic" nature of her family. Levy testified that R.H. was engaging and friendly but that she exhibited sexualized behavior and described to Levy that a boy liked her, got undressed, and kissed her on the mouth. Levy testified that this raised concerns about inappropriate boundaries, sexualized acting out, and inadequate supervision. When Levy asked her about possible sexual abuse, R.H. said that she was concerned that if she talked to Levy she would get in trouble with her grandmother. Levy testified that R.H. then stated: "My daddy touched me. [] On my private parts. And, I said , Please, please, daddy, don't. He went to jail and now he's out of jail, and he's going to get me a new house. He don't love me." Levy stated that this outcry about sexual abuse was consistent with the sexualized behavior R.H. was exhibiting. Levy diagnosed R.H. with adjustment disorder with a disturbance of conduct and determined that she had been neglected and sexually abused.

Terry Cooper testified that W.C. participated in some, but not all, of the services included in the permanency plan. W.C. completed basic and protective parenting classes, completed

18

individual therapy, and completed a psychosexual and psychological evaluation. W.C. missed several hearings in the case, did not show up for a December 2011 appointment with Cooper, and did not have any further contact with the Department until the hearing in August 2012. Cooper stated that W.C. has not visited or had any contact with C.H. or R.H. during the pendency of the case, nor has he provided them any financial support.

Cooper stated that W.C. had failed to complete his services and the activities ordered by the court. Specifically, W.C. did not complete sex offender therapy, did not take a psychiatric evaluation, and did not do any drug screening since the spring of 2011. Cooper recommended termination of W.C.'s parental rights based on his opinion that C.H. and R.H. needed an environment free from domestic violence and substance abuse, and in his opinion W.C. had not demonstrated an ability to provide that.

Having reviewed the evidence, we conclude that a fact-finder could reasonably form a firm belief or conviction that W.C. placed or allowed C.H. and R.H. to be placed or remain in conditions that endangered their physical and emotional well being. *See* Fam. Code § 161.001(1)(D). Not only did he leave the children with L.H., a person he described as mentally ill and violent, he also left them with a person he did not know well and in whose care the children were neglected. Because it is only necessary that we determine that the evidence was legally sufficient as to one predicate act under section 161.001(1), we need not address the sufficiency of the evidence relating to sections 161.001(1)(E), (N), or (O). *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We overrule W.C.'s first appellate issue.

In his second issue, W.C. challenges the factual sufficiency of the evidence supporting the jury's finding that termination of his parental relationship with C.H. and R. H. was in their best interest. As set forth above, there was evidence presented at trial showing that W.C. led an unstable lifestyle and was neglectful if not sexually abusive to the children. He endangered their welfare by leaving them with inappropriate caretakers. W.C. testified he was currently living with a girlfriend and her two small children and was being harassed by his most recent ex-girlfriend, who claims he is the father of her child. W.C.'s plan to "break up" with his girlfriend, get a job, and move into a house if given custody of the children is a complete reversal of his current situation and could have been discounted by the jury. W.C. has demonstrated a pattern of choosing emotionally disturbed romantic partners and having an emotionally tumultuous personal life. When he has been employed, his work has required that he be absent from the children for periods of time, leaving them in the care of others.

Terry Cooper testified that he had observed the children in the foster home and that they appear to be securely attached to their foster mother. According to Cooper, the foster mother has indicated that she is willing to be a long-term placement for the children and is a potential adoptive placement. Cooper stated that no decision had been made about permanent placement for the children in the event the parental rights were terminated, but that all options would be explored and considered, including placement with the children's maternal grandparents.

As previously observed, the children are in a foster placement with a committed and engaged foster mother with whom they have formed a strong bond. C.H. and R.H. are receiving therapy and appropriate medical care and have developed a sibling-like relationship with their foster

sister. Granberry testified that this type of stable environment and therapy is necessary for the children to develop the healthy personal boundaries they need to avoid becoming future victims of sexual abuse.

We conclude that the evidence is factually sufficient to support the jury's finding that termination of W.C.'s parental rights to C.H. and R.H. is in the children's best interest. We overrule W.C.'s second appellate issue.

## CONCLUSION

Having overruled L.H.'s two appellate issues, we affirm the trial court's judgment terminating her parental rights to C.H., R.H., and G.H. Having overruled W.C.'s three appellate issues, we affirm the trial court's judgment terminating his parental rights to C.H. and R.H.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Affirmed

Filed: January 8, 2013

21